575 A.2d 816

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
FRANK PENNINGTON, DEFENDANT–APPELLANT.

Argued November 6, 1989—Decided June 21, 1990.

548

552

554

*Lois De Julio*, First Assistant Deputy Public Defender, and *James L. Jukes*, Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorney).

*Nancy A. Hulett*, Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

A jury found defendant, Frank Pennington, guilty of capital murder, felony murder, and possession of a firearm with the intent to use it unlawfully. He appealed the capital conviction as of right. *R.* 2:2-1(a)(3). As the State concedes, the trial court failed to instruct the jury that defendant was not guilty of capital murder if he knowingly or purposely caused serious bodily injury that resulted in death, as distinguished from knowingly or purposely causing the death of the victim. That failure contravenes our subsequent decision in *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988), and requires reversal of defendant's conviction for capital murder.

–I–

The tragic events underlying this appeal occurred shortly after 1:00 a.m. on September 2, 1986, in "Sarge's," a neighborhood bar in East Rutherford. Defendant arrived about 11:30 p.m. A half hour later, the victim, Arlene Connors, came to help her daughter, Pam, close the bar. At about 1:00 a.m., Arlene announced that she was closing for the night. Defendant, who had drunk three beers at Sarge's, asked for a fourth, which Arlene poured while he went to the men's room. The other customers left, and defendant returned to his seat at the bar. While Pam started to sweep the floor, Arlene washed glasses in the sink opposite defendant.

The ensuing events, critical to this appeal, are subject to various interpretations. The parties agree on few material facts, except that defendant fired a single shot, which struck the victim in the heart, killing her. In a statement given to the police the night of the shooting, Pam stated that while facing away from the bar, she heard her mother curse at defendant. When she turned around, she saw her mother throw a glass at defendant. She then noticed a smoking gun in defendant's hand and heard her mother yell, "He shot me."

At trial, however, Pam denied that she saw her mother throw a glass at defendant. There, she testified that while she was turned away from the bar, she heard her mother say to defendant, "I hate to tell you this, but it's the bewitching hour." Defendant responded, "Bewitch this." Almost simultaneously, Pam heard "a lot of commotion," including the sound of breaking glass. Her mother said, "You son of a bitch." Turning around, Pam saw her mother leaning on the bar with the bottom of a broken glass in her right hand. Pam's trial testimony was corroborated to some extent by broken glass at the scene, which was located almost exclusively on the bartender's side, but not on the customer's side, of the bar.

In a sworn statement given to the police, defendant described a sequence of events similar to those included in Pam's state-

ment, but different from her trial testimony. Defendant related that after the other customers had left, he pulled from his waistband a gun, which had three safeties. He told the victim, "I don't want to hurt nobody, I just want the money at the register." He then turned to Pam and told her to join her mother behind the bar. When he turned back to face Arlene, she cursed and threw a glass, which hit him in the chest. Defendant ducked to avoid the glass, and as he straightened up, he pulled the trigger of his gun. Defendant did not recall when he removed the three safeties on the gun, but speculated that he may have done so when he announced the robbery or after he ducked to avoid the thrown glass.

While giving his statement to the police, defendant physically demonstrated the events surrounding the shooting. At trial, Sergeant John Scioli of the Bergen County Prosecutor's Office reenacted defendant's movements. According to Sergeant Scioli, defendant stood facing Arlene with the gun in his right hand and his arm extended perpendicularly from his body. When Arlene threw the glass, defendant bent down to the left, bringing his right arm across the front of his body. Then he straightened up, and with his right hand at waist height pulled the trigger. The sergeant related defendant's description: "I just sort of ducked, and as I came back up, you know, like I don't feel like I really meant to shoot her, I just pointed the gun, and it just went off. I don't even remember taking the safety off the gun." Sergeant Scioli also related that defendant said that the victim's actions made him shoot. Believing that he had shot her in the shoulder, defendant did not realize that she was seriously injured. Showing the sergeant a scratch on his chest, defendant indicated it might have been inflicted when Arlene threw the glass at him.

At trial, the State challenged defendant's contention that a thrown glass could have caused the scratches on his chest. The State presented photographs that had been taken the day after defendant gave his statement to the police. According to the State, other injuries on defendant's body demonstrated that the

chest scratches were too old to have been inflicted on the night of the shooting. Defendant countered with expert testimony that the wound on his chest could have been caused by impact of a blunt object such as a thrown glass, even if the glass did not break.

Defendant's wife, who had waited for him in their car outside the bar during the robbery, corroborated his version of the shooting. She testified that when defendant returned to the car, his hair and shirt were wet, and he smelled like beer. In addition, as defendant entered the car, he told his wife, "I just shot a woman. I didn't mean to do it. I didn't want to do it. I just shot a woman."

Medical experts disagreed whether the angle of the path of the bullet confirmed the State's or defendant's version of the shooting. The bullet had entered the victim's body on the outside of the left breast and had traveled in a downward path. From this and other evidence, the State's expert concluded that the shooting could not have occurred as described by defendant. Defendant's forensic pathologist concluded, however, that defendant must have returned to an upright position after ducking to avoid the glass. According to defendant's expert, if defendant had been standing upright and the victim had ducked, the bullet would have caused a wound consistent with that actually inflicted.

In October 1986, a Bergen County grand jury charged defendant with purposeful or knowing murder, in violation of *N.J. S.A.* 2C:11-3a(1) and -3a(2); felony murder, in violation of *N.J.S.A.* 2C:11-3a(3); and possession of a firearm with the purpose to use it unlawfully, contrary to *N.J.S.A.* 2C:39-4a. Pursuant to *Rule* 3:13-4(a), the prosecutor served defendant with a notice of aggravating factors that the State would seek to prove in support of a death sentence. See also *N.J.S.A.* 2C:11-3c(2)(e) (requiring the prosecutor in a capital case to give the defendant notice of any aggravating factors prior to the sentencing proceeding). In that notice, the State alleged that

defendant had previously been convicted of murder and that the subject murder was committed while defendant was engaged in a robbery. *N.J.S.A.* 2C:11–3c(4)(a) and –3c(4)(g).

Because the evidence regarding defendant's intent in shooting the victim was ambiguous, the trial court instructed the jury not only on the three crimes charged in the indictment, but also on aggravated manslaughter and reckless manslaughter. *N.J.S.A.* 2C:11–4a and –4b(1). The jury, however, found defendant guilty of the three indicted offenses: purposeful or knowing murder, felony murder, and possession of a firearm with the intent to use it unlawfully.

–II–

Defendant argues that his conviction for capital murder must be set aside in light of our decision in *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792. We agree. The offense for which defendant was convicted, purposeful or knowing murder, includes both the intent to cause death or the intent to cause serious bodily injury. *Id.* at 83, 549 *A.*2d 792. In *Gerald,* we held that "a defendant who is convicted of purposely or knowingly causing 'serious bodily injury resulting in death' under *N.J.S.A.* 2C:11–3a(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty." *Id.* at 69, 549 *A.*2d 792. Because the instructions in this case did not satisfy *Gerald,* we cannot determine whether the jury convicted defendant of purposely or knowingly causing death or purposely or knowingly causing serious bodily injury that resulted in death. Without that determination, defendant may not be convicted of capital murder.

Although this trial preceded *Gerald,* the court, to its credit, considered the constitutionality of imposing the death penalty on one who intended to cause only serious bodily injury. Specifically, the court noted our statement in *State v. Ramseur,* 106 *N.J.* 123, 194, 524 *A.*2d 188 (1987), that "while intent to do

only serious bodily harm could not formerly support a first-degree murder charge, it may similarly be insufficient to support a capital sentence today because of the consitutionally required culpability standards regarding a capital defendant's intent to kill." Relying on the United States Supreme Court decision in *Tison v. Arizona*, 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), however, the trial court concluded that it would be constitutional to impose the death penalty for purposeful or knowing murder, even if the defendant did not intend to cause death. As a result, in its jury instructions, the court did not distinguish between the different intended consequences. Instead, in defining purposeful or knowing murder, the trial court stated, in relevant part:

> Now, let me get to the issue which has been the focus, I think it's fair to say, of the arguments of the attorneys, and that is, whether Frank Pennington did indeed act purposely or knowingly on the night in question.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> "Purposely" means intentionally. It means somebody acted with the intent or the design or the conscious object of accomplishing something. In the context of this case, when we ask if Frank Pennington acted purposely, the question is whether, when he acted, he did that with the conscious object, the intent, the purpose, of causing the death of Arlene Connors or causing her serious bodily injury resulting in her death.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> [W]hen you ask if Frank Pennington acted knowingly, the question is whether he knew, was he aware that his shooting Arlene Connors, if you find that he did shoot Arlene Connors, was practically certain to cause her death or serious bodily injury resulting in her death?

■ Omission of a *Gerald* charge is reversible error if the evidence is "minimally adequate" to provide a rational basis for the jury to find that defendant intended to cause serious bodily injury. *State v. Pitts*, 116 *N.J.* 580, 615, 562 *A.*2d 1320 (1989). Our review of the record leads us to conclude that defendant cleared this "low threshold." *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986).

According to defendant, he was startled when the victim threw a glass at him, and he fired his gun reflexively. That account of the shooting is supported by Pam Connors' state-

ment that she saw her mother throw a glass at defendant. Moreover, defendant's wife testified that he told her immediately after the shooting, "I just shot a woman. I didn't mean to do it."

■■ Contrary to the State's assertions, the fact that the defendant fired a single shot that hit the victim's heart does not necessarily prove that defendant intended to kill. Although the shooting occurred at close range, the evidence does not compel the conclusion that defendant aimed for the heart. In fact, Sergeant Scioli testified that defendant thought the bullet had struck the victim in the shoulder. Likewise, defendant's removal of the gun's three safeties does not necessarily indicate an intent to kill. Defendant would have had to remove the safeties even if he had intended to cause serious bodily injury rather than death.

■ In deciding to instruct the jury on aggravated and reckless manslaughter, the trial court concluded that "there is evidence on which the jury could accept a version which, either the gun went off accidentally or the gun went off as an, almost, reflective [sic] reaction after Mrs. Connors threw the glass or drink at Mr. Pennington." See State v. Rose, 112 N.J. 454, 482, 548 A.2d 1058 (1988) (rejecting defendant's argument that jury should have been charged on aggravated manslaughter because evidence indicated shooting was volitional). Thus, the court believed the evidence supported the conclusion that defendant's conduct was either knowing or purposeful, on the one hand, or, on the other, that it was reckless. To the extent that the evidence sufficed to support a charge that defendant acted recklessly, it raised the possibility that he did not intend to cause death. That possibility, on the facts of this case, suggests that the jury reasonably could have found that defendant intended to cause not death but serious bodily injury. The question is not whether a finding of intent to cause serious bodily injury is likely, but whether the evidence provides a rational basis for such a finding. If so, the jury should have

been permitted to accept or reject that alternative. Given the inherent ineffability of mental states, the determination of defendant's specific intent is best left to the jury. *Crisantos, supra,* 102 *N.J.* at 284, 508 *A.*2d 167 (O'Hern, J., concurring in part and dissenting in part). Indeed, the care taken by the trial court in constructing its charge leads us to conclude that had *Gerald* been decided before the trial of this matter, the court would have conformed its charge to that opinion. Because the court did not instruct the jury in accordance with *Gerald,* however, we reverse defendant's conviction and remand the matter for retrial.

■ Our dissenting colleague Justice Stein disagrees with that result. He recognizes that "the critical issue at trial was defendant's mental state," *post* at 618, 575 *A.*2d at 853, and he acknowledges "that there may be an identifiable ambiguity in the jury's verdict * * *." *Ibid.* He does not believe, however, that the evidence "suggests that defendant's 'conscious object' was to cause only serious bodily injury, but not death, to Mrs. Connors, or that defendant was 'practically certain' that only serious bodily injury, but not death, would result from the shooting." *Post* at 619, 575 *A.*2d at 854. Significantly, the dissent states that

[i]t is quite conceivable that on this record the jury could have concluded that defendant intended to cause either death or serious bodily injury, being indifferent to which of those consequences actually occurred. In view of the jury's conclusion that defendant did not fire the gun accidentally or recklessly, it is consistent with the evidence for the jury's verdict to have constituted a determination that defendant's "conscious object" was either to kill or to seriously injure Mrs. Connors, or that defendant was "practically certain" that death or serious bodily injury would occur, and that defendant did not consciously distinguish between those results.

[*Post* at 619, 575 *A.*2d at 854.]

As the dissent reads *Gerald,* "a defendant whose purpose is to cause either death or serious bodily injury, either being an acceptable result, remains subject to the death penalty." *Ibid.* He acknowledges, however, "that the jury charge in this case was not consistent with our holding in *Gerald* * * *." *Ibid.* Having found the charge to be erroneous, he further finds the

error harmless, because "there is no rational basis in this record for" a verdict "that defendant's intention was only to cause serious bodily injury to Mrs. Connors, but not death." *Post* at 620, 575 *A.*2d at 854. Our reading of both *Gerald* and of the record differs from that of the dissent.

*Gerald* plainly holds that a defendant whose purpose is to cause serious bodily injury is not subject to the death penalty. 113 *N.J.* at 89, 549 *A.*2d 792. Under *Gerald,* a defendant is subject to the death penalty only if he or she intended the victim's death. *Id.* at 85, 549 *A.*2d 792. Thus, a defendant whose intent is "to cause either death or serious bodily injury, either being an acceptable result," *post* at 620, 575 *A.*2d at 854, is not subject to the death penalty. *Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792.

As explained above, moreover, we find the evidence to be sufficient to support a *Gerald* charge. *Supra* at 561–563, 575 *A.*2d at 822–823. The trial court found the evidence sufficient to support charges on knowing or purposeful murder, aggravated manslaughter, and reckless manslaughter. Without the guidance of *Gerald,* which had not been decided at the time of trial, the court charged the jury that it could find defendant guilty of knowing or purposeful murder if it found that in shooting Mrs. Connors, he "was practically certain to cause her death or serious bodily injury resulting in her death." Thus, the court believed that the evidence would support a verdict that defendant had intended to cause only serious bodily injury.

Through the manslaughter charges, the court in effect told the jury that it could find defendant guilty of aggravated or reckless manslaughter if it determined that he had not intended to cause either death or serious bodily injury. Implicit in those charges, therefore, was the court's belief that the evidence was sufficient to establish that defendant had not acted intentionally when shooting the victim. It is too fastidious to conclude that the evidence would not support a charge that defendant

had acted intentionally, but with the intent to cause serious bodily injury rather than death. *See post* at 615–616, 575 *A*.2d at 852.

The jury should determine where defendant's mental state falls on the spectrum between the intent to cause death and reckless conduct. In light of *Gerald*, defendant should not have been found guilty of capital murder if the jury believed that he had acted with the intent to cause serious bodily injury. Because of the understandable failure of the charge to distinguish between capital and non-capital murder, we cannot determine whether the jury found defendant guilty of an offense for which he should be put to death. Consequently, we must reverse his conviction.

–III–

Defendant also asserts as reversible error numerous instances of prosecutorial misconduct. Because we are reversing both the guilt and penalty verdicts on other grounds, "we need not determine the likelihood that the prosecutor's misconduct led to an unjust verdict." *State v. Williams*, 113 *N.J.* 393, 446, 550 *A*.2d 1172 (1988). Our review of the record, however, leads us to conclude that the prosecutor, if he did not cross the line of impropriety, came perilously close to committing reversible error. To avoid problems on remand, we offer the following guidelines.

As a general rule, the test for determining whether prosecutorial misconduct constitutes reversible error is whether the misconduct "was so egregious that it deprived defendant of a fair trial." *Ramseur, supra*, 106 *N.J.* at 322, 524 *A*.2d 188. The "fair trial" standard applies to alleged prosecutorial misconduct in both the guilt, *State v. Koedatich*, 112 *N.J.* 225, 323, 548 *A*.2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), and penalty phases of a capital trial, *Rose, supra*, 112 *N.J.* at 509–11, 548 *A*.2d 1058. Defendant, however, urges that we adopt an even stricter standard and

that prosecutorial misconduct should compel a reversal in a death penalty case unless it had "no effect" on the sentencing decision. *Caldwell v. Mississippi,* 472 *U.S.* 320, 341, 105 *S.Ct.* 2633, 2646, 86 *L.Ed.*2d 231, 247 (1985). In *Caldwell,* the United States Supreme Court adopted the "no effect" test in a case in which the prosecutor improperly told the jury during his penalty-phase summation that it was not ultimately responsible for the defendant's death because the defendant could appeal the verdict. *Id.* at 324–26, 105 *S.Ct.* at 2637–38, 86 *L.Ed.*2d at 236–37. Just one year after deciding *Caldwell,* however, the Court refused to extend the "no effect" test to prosecutorial misconduct in the guilt phase of a capital trial. See *Darden v. Wainwright,* 477 *U.S.* 168, 106 *S.Ct.* 2464, 91 *L.Ed.*2d 144 (1986). The *Darden* Court stated that the "no effect" test applies only to those comments that "mislead the jury as to its role in the sentencing process in a way that allows it to feel less responsible than it should for the sentencing decision." 477 *U.S.* at 183 n. 15, 106 *S.Ct.* at 2472–73 n. 15, 91 *L.Ed.*2d at 158–59 n. 15. As we read *Darden,* the "no effect" test does not apply in other contexts, such as those presented on this appeal. Thus, the test by which we shall evaluate the prosecutor's misconduct is whether it was so egregious as to deny defendant a fair trial.

Applying the "fair trial" standard, we find the prosecutor's conduct wanting in six separate areas: in both phases, he introduced prejudicial victim-impact evidence, referred to other crimes committed by defendant, instructed the jury to convict, and made derogatory references about defendant; and in the penalty phase, the prosecutor improperly cross-examined defendant's experts and referred to defendant's future dangerousness.

## A. *Use of Victim–Impact Evidence*

 Throughout the guilt and penalty phases of the trial, the prosecutor consistently emphasized the character and background of the victim, as well as the impact of her death on her

family. Defendant challenges those statements on the grounds that (1) use of such inflammatory and prejudicial evidence during the guilt phase denied him due process of law under the state and federal constitutions, and (2) use of the evidence to encourage the jury to return a death sentence violated the eighth amendment of the United States Constitution. Although we need not resolve those constitutional claims, we are satisfied that the extensive discussion of the victim and her family's grief were inappropriate.

In his opening remarks during the guilt phase, the prosecutor focused extensively on the victim:

> Arlene Connors is not here. But once she looked, she touched, she spoke, she saw, she breathed, she lived. She even loved. She cannot come into this courtroom in flesh and blood and tell you what happened to her. She will rely, because she has been robbed by him of voice and memory, she will rely on the voices and memories of those who loved her, who will tell you how she was murdered by that cruel man.
>
> Arlene Connors, through their memories, through their voices from that witness stand, flesh and blood, will live again and she must live again in this courtroom because you must know what kind of a woman was killed and how important this case is.
>
> Let us consider for a moment that life and memory. Let us consider Arlene Connors.
>
> At the time of her death, September 2nd, 1986, Arlene Connors was fifty-six years old, robust health, many fruitful years before her. She was a loving wife to her husband Frank. She loved and was loved by eight children for whom and in whom her memory still lives and will always live. She had sixteen grandchildren.
>
> She and her husband Frank were in the tavern business and had been for many years. They were just basic ordinary people. They didn't own a Glitzy [sic] glamorous club. They owned a simple neighborhood bar called Sarges in East Rutherford. It was named after Frank Connors' rank in the Marine Corps. * * * They made a modest living with the help of their children. Their children worked the bar with them. Their children, who each held down their own full-time separate jobs, helped mom and pop run the bar. As they still do, for Frank Connors alone because this is a living family, and a close, tightly-knit family.

During the trial, the prosecutor elicited testimony from both Pam and Tommy Connors regarding their parents and family. Pam Connors described her last hours with her mother on the day of the shooting. The prosecutor then used that testimony

during his guilt-phase summation to focus the jury's attention on the victim:

> Pam Connors got a gift on September the 1st, 1986. It was the gift of spending the last full day of her mother's life together with her. It was a sunny holiday, unmarred of the clouds of tragedy that were to come. She will cherish that gift, however, next to the memory of the terror and the tears of her mother's murder.

> \* \* \* \* \* \* \* \*

> Why is the truth so necessary? Why, \* \* \* do [you] have to face perhaps a hard question and find him guilty of purposeful or knowing murder? \* \* \* I think the best answer to that is an indirect answer, and I think it was given to us by Tommy Connors. \* \* \* Tommy Connors says at one o'clock in the morning he was summoned from sleep by his sister Pam who was calling out to him hysterically, like a school girl, a child, Mommy's been shot. Mommy's been shot. In those situations we are all children again. He came down and he ran into that bar and he knelt down by his mother and he called for a blanket. He covered his mother to keep her warm. He spoke to her. He told her, I love you. I love you. I love you. He tried to lift her head so he could remove some more of the glass, but he couldn't because her head was too heavy and he was afraid that he would hurt her. I love you, Ma. I love you.

In his closing remarks, the prosecutor implied that the jury would "insult" the victim and "dishonor" the State's witnesses if it accepted defendant's version of the facts and did not find him guilty of capital murder:

> [Defendant] invites you to insult your memory of Arlene Connors. So don't accept that invitation.

> \* \* \* \* \* \* \* \*

> Ladies and Gentlemen of this jury, do not insult Arlene Connors with lies and do not dishonor dedicated police officers like Sergeant John Scioli by rendering a verdict which call them liars.

> \* \* \* \* \* \* \* \*

> That's why it's important; flesh and blood. Because Arlene Connors was a human being who, Ladies and Gentlemen, was loved. She was flesh and blood and her memory deserves the truth. Don't dishonor it. Don't become his accomplices in lies and deceit. Don't become like he is, a coward who cannot face the truth. Don't insult Arlene Connors' memory.

> \* \* \* \* \* \* \* \*

> Whatever else you do in this case, whatever else you do in the second phase, give Arlene Connors and her family the dignity and the truth that they deserve as human beings. Arlene Connors relied on her children to give her voice and memory and now she relies on you.

The prosecutor made similar statements during his penalty-phase summation:

> Our law is merciful. Our law is tolerant but we are not speaking here of mitigating a theft or a burglary even or even one murder. Two murders. The things that he has put before you in that regard seem to me irrelevant. As irrelevant as the tears that [defense counsel] coaxed from his poor, unfortunate mother. For against those I could set the tears of Pamela, Tommy Connors, the entire Connors family for those tears tell us more about Frank Pennington. They tell us about his character, about his actions in sowing sorrow.
>
> \* \* \* \* \* \* \* \*
>
> And so one final time I'm going to ask you to live up to your oath and apply [the] law. I'm going to ask you to reratify and exhalt that law which holds us together. I'm going to ask you to return the verdict that says that Frank Pennington alone is responsible; that he himself has brought himself here by his own chosen action; that he is responsible, not his mother, not the Marines, not the system, not anyone but himself. I'm going to ask you to announce that the law that keeps us together and is patient and long suffering and merciful must finally, *even if it's just for the victim*, be just.
>
> [Emphasis added.]

The United States Supreme Court has held that admission of a victim-impact statement in a capital case violates the eighth amendment because it "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Booth v. Maryland*, 482 *U.S.* 496, 505, 107 *S.Ct.* 2529, 2534, 96 *L.Ed.*2d 440, 450 (1987). In *Booth*, the Court condemned the use of evidence showing "family members' opinions and characterizations of the crimes." *Id.* at 508, 107 *S.Ct.* at 2535, 96 *L.Ed.*2d at 451. As the Court noted,

> [o]ne can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of those feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant.
>
> [*Id.* at 508, 107 *S.Ct.* at 2536, 96 *L.Ed.*2d at 452.]

Thus, the admission of a formal victim-impact statement is wrong. Other evidence regarding a victim's character or personal life may be admitted if relevant to a disputed issue and if the probative value of such evidence outweighs the risk of undue prejudice or confusion. *Evid.R.* 4. Although the scope of *Booth* is unresolved, *South Carolina v. Gathers*, 490 *U.S.*

——, ——, 109 *S.Ct.* 2207, 2212, 104 *L.Ed.*2d 876, 884 (1989) (O'Connor, J., dissenting), the Supreme Court has also found reversible error where the prosecutor rather than the victim's survivors describe the victim's personal characteristics to a capital jury. *Id.* at ——, 109 *S.Ct.* at 2210–11, 104 *L.Ed.*2d at 883. We recognize that it is impossible to avoid referring to the victim in a capital trial. As we have stated, however,

[t]his evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence. There are occasions when evidence relating to the victim's character and personality may be probative of critical aspects of the trial, *e.g.*, defendant's assertion of self-defense or provocation. Where, however, * * * the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury.

[*Williams, supra*, 113 *N.J.* at 451–52, 550 *A.*2d 1172.]

We need not detail each of the prosecutor's references to the victim to conclude that he tried to inflame the jury to impose the death penalty based on factors that the law deems to be irrelevant. Although the evidence reveals that Arlene Connors was a good woman with a loving family, a murder conviction or death sentence cannot be grounded on the character of the victim. To conclude otherwise would imply that "defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. * * * [O]ur system of justice does not tolerate such distinctions." *Booth, supra*, 482 *U.S.* at 506 n. 8, 107 *S.Ct.* at 2534 n. 8, 96 *L.Ed.*2d at 450 n. 8. Consequently, the prosecutor should not have played on the understandable grief of the Connors family. Such comments effectively devalue the deaths of those victims who have no family or those whose relatives are "less articulate in describing their feelings even though their sense of loss is equally severe." *Id.* at 505, 107 *S.Ct.* at 2534, 96 *L.Ed.*2d at 450.

On the evidence, it was virtually a foregone conclusion that defendant would be convicted of some kind of homicide. Defendant did not dispute that he shot the victim in the course of a

robbery. Contrary to the State's contention, the prosecutor's comments cannot be justified as "a comment on the circumstantial nature of the evidence." A realistic reading of the comments leads to the inevitable conclusion that the prosecutor intended to divert the jury from the material facts to the worthiness of the victim. He intended to use the character and family of the victim to excite the jury. *See, e.g., id.* 482 *U.S.* at 509–11, 107 *S.Ct.* at 2536–37, 96 *L.Ed.*2d at 453. Defendant's culpability for capital murder, however, depends not on whether the victim was a good or bad person, but on the elements of the offense. The prosecutor's comments were unnecessary and inappropriate. As we stated in *Williams,* even "[c]onceding that any capital case will be prone to emotional displays by those giving testimony, * * * it is not too much to expect and require that officers of the court conduct themselves without resorting to improper appeals to the jury's emotions." *Ibid.*

### B. *Evidence of Other Crimes*

Defendant also alleges that during the guilt phase, the prosecutor deliberately informed the jury of other crimes he had committed, even though evidence of those crimes was not admissible. Before trial, the court had denied the State's motion to introduce evidence of another robbery committed by defendant shortly after the shooting. Nonetheless, when cross-examining defendant's wife, the prosecutor embarked on the following line of questioning:

Q. And you went to a motel, isn't that correct?

A. Yes.

Q. But he [defendant] didn't go into the motel. You went into the motel?

A. Yes.

Q. Did he tell you how much money he got from the robbery and from the murder?

A. At that time?

Q. Yeah.

A. No.

Q. Did he give you money from the robbery in order for you to register at the motel?

A. Yes.

Q. And in fact he told you he didn't get enough money, isn't that correct?
A. Yes.
Q. And you went into the motel alone?
A. Yes.
Q. And he went elsewhere, is that correct?
A. Yes.

The trial court reprimanded the prosecutor during his guilt-phase summation for referring to defendant's disappointment with the amount of money he obtained from robbing "Sarge's":

He's so upset, this cold man with ice here, is so upset, but he's okay to drive, he's drenched with beer, but he doesn't go into the motel room to change or wash, he goes elsewhere. Sure, we know, she told us, he's upset. You know what he was upset about? In his words that she conveyed from the witness stand: He was upset, as he told her, because he didn't get enough money from robbing and killing Arlene Connors. So he didn't go into the motel, he went elsewhere and she went in alone. Mary Claire Pennington, just like him.

THE COURT: * * * I don't know what was implied when you referred to going elsewhere, but there has been no testimony as to where anyone went after this incident and certainly the jury should not draw any inferences from that or take any account of it. There is nothing in the record about that and there shouldn't really be any reference to it. And I'll ask the jury to ignore it.

Go ahead please.

At another point in his summation, the prosecutor implied that defendant had committed other robberies by referring to defendant and his wife as "professionals" for whom robbery was a way of life. Moreover, the prosecutor insinuated that defendant had previously used the murder weapon:

THE STATE: Mary Claire Pennington, just like her husband, because what does she do when he goes in to do the stick up? She falls asleep. Doesn't bother her. She's not nervous. Catch a few winks. Just like her husband. A stick up, nothing out of the ordinary, just another everyday occurrence. Just like her husband, just like him.

Now she tells you the story. Didn't tell it to the investigators when they were talking to her after the arrest, but she comes in and she gives you his version. And, of course, [defense counsel] says, well, the only way we can know what was in his mind is from his wife.

We know what was in his mind. He told us already in black and white. But conveniently she remembers now that she was sleeping and she's awakened by pounding on the window and she sees her husband, she let's [sic] him in, and his hair is soaked with beer, his face is soaked with beer. There is beer on his clothing. And he just happens to tell her, I just killed a woman, I didn't mean to do it, I didn't want to do it. He's so upset, this professional, this professional is so—

[DEFENSE COUNSEL]: I object, Judge.

THE COURT: Sustained. I don't want any further references to her as a professional and particularly no further references as to something being [an] ordinary run of the mill event. We're talking about this event and there is no indication of any professionalism or anything else other than this event.

And I'll ask the jury to please disregard any such comments.

\* \* \* \* \* \* \* \*

THE STATE: But Frank Pennington said something very important in his statement about reflexes. Do you remember it? Do you remember it? He was trying to convince Scioli that maybe it was a reflexive action, so he said, well, I don't know how the safety got taken off, he said it one time, well, you know, maybe it was my belt, it was rubbing against my belt, although maybe when I was coming up from the crouch, I took it off in a reflex. What does that tell you? He's used it before. He knows this gun. He knows the three safeties. He's had it since August and he's fired it. So familiar that this gun is not going to go off accidentally.

Although defense counsel did not object to the prosecutor's reference to defendant's prior use of the gun, the trial court on its own motion instructed the jury not to infer from the prosecutor's statements that defendant had committed other crimes:

I want to make one other point on something [the prosecutor] said when he referred to Mr. Pennington being familiar with this gun and having used it before. I take it [he] meant by that or he was demonstrating familiarity with the gun and was not suggesting, I assume he was not suggesting, that it had been used in any prior crime or in any other way, because there is no evidence of that. That is not part of this case. As I say, I don't think that's what was being suggested, but please, if any of you drew any inference of that, put it out of your minds. His familiarity with the gun has some significance as to what he might have done in Sarges Tavern that night, but shouldn't be read by anyone as suggesting any other criminal activity of any kind.

In an apparent attempt to inflame the jury during the penalty phase, the prosecutor also presented inadmissible evidence regarding defendant's prior murder conviction. At trial, the court ruled that the State could present evidence regarding only the name and age of the victim, the manner of death, and the victim's relationship to the defendant. See *N.J.S.A.* 2C:11–3c(2)(f). The State and defense counsel then stipulated to a statement regarding the prior murder conviction. The stipulation provided:

Frank Pennington, as a result of a plea, was found guilty of first degree murder February 19, 1974, of the murder of Robert Davis, age thirty-three

years. The autopsy on Robert Davis revealed that he had been shot with a shotgun in the back of his right thigh and in the right side of his head. Death was caused by the shotgun wound to the head, which lacerated the victim's brain. Mr. Pennington and Mr. Davis were not related.

Despite the court's ruling and the stipulation, the prosecutor stated during his penalty-phase opening:

> When Frank Pennington entered Sarges Tavern, September 1st, 1986, he did not just carry death with him on that date. Death was an ingrained action and purpose in Frank Pennington.
>
> On February the 19th, 1974 he took a shotgun in Newark, New Jersey, shot a young thirty-three year old man in the back of the leg with that shotgun and then blew away half his face.
>
> THE COURT: Delete the reference to "blew away half his face." That's not part of the record in this case. Please ignore it.

Disregarding that reprimand, the prosecutor again violated the stipulation during his penalty-phase summation:

> There are no doubts about them [the two aggravating factors]. He admits to them. That this murder here, the murder of Arlene Connors, was committed during the course of a robbery; and that he has a prior murder in 1974 in which he took a shotgun[,] crippled another human being and shot him in the face.

Defense counsel did not object, and the trial court did not issue a curative instruction.

On numerous occasions during his cross-examination of the defense psychiatrists, the prosecutor also violated the court's ruling that he could refer only to the facts of defendant's other criminal offenses and not the details of the underlying crimes. For example, when cross-examining the defense's first expert witness, Dr. Seymour Kuvin, the prosecutor asked: "[Y]ou do know from reading the army reports or excuse me, the Marine Corps discharge summary that he [defendant] did have an incident for attempting to kill his art teacher. Is that correct? You recall that? You read that?" Defense counsel did not object, and a short time later the prosecutor then asked Dr. Kuvin: "You are aware on one of the first occasions when he spoke to the [other] psychiatrist, he indicated that the reason he had slashed that person and robbed * * *." Defense counsel immediately objected, and the trial court instructed the jury to disregard the reference to "slashing."

We have no doubt that the prosecutor's conduct was improper. Long before this trial, it was well established that an attorney shall not "in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence * * *." *Rules of Professional Conduct, RPC* 3.4(e) (1983); *accord State v. Johnson,* 65 *N.J.* 388, 391–92, 323 *A.*2d 450 (1974) (prosecutor exceeded bounds of fair play by emphasizing defendant's past criminal record during cross-examination and summation). We need not go so far as to say that an ethical violation occurred in this case, *see Ramseur, supra,* 106 *N.J.* at 323 n. 83, 524 *A.*2d 188, to state that the prosecutor's conduct was clearly inappropriate.

## C. *Instructing the Jury to Convict*

■ Defendant also claims that during his guilt- and penalty-phase summations, the prosecutor erroneously told the jury that it had a "duty" to convict him. In his guilt-phase summation, the prosecutor stated, in relevant part:

And so we come to the end. We come to the time for the truth and maybe you still have in your mind that question: Why is the truth so necessary? Why * * * do I have to face perhaps a hard question and find him guilty of purposeful or knowing murder? Why can't I just take the easy way out? Why can't I accept the [defendant's] invitation [to convict defendant of felony murder]?

I could tell you, and I will, that it is the law. But you may say to me, the law is only cold words on cold paper, and you will not have gotten the full understanding. I could say to you, and I will, *that is your oath.*

\* \* \* \* \* \* \* \*

Consider your oath, not as old words and cold paper, but as a warm and solemn obligation to tell the truth, the obligation of flesh and blood to flesh and blood.

[Emphasis added.]

Then during his closing remarks at the penalty phase, the prosecutor continued that same theme:

And so one final time I'm going to ask you to live up to your oath and apply [the] law. I'm going to ask you to reratify and exhalt that law which holds us together. I'm going to ask you to return the verdict that says that Frank Pennington alone is responsible * * * I'm going to ask you to return the verdict that's called for *by your oath,* by the law, by the evidence, that the aggravating

factors here, shotgun murder, robbery, here far outweigh those minuscule excuses that he has proffered.

\* \* \* \* \* \* \* \*

I will thank you now one last time for your courage not to flinch in applying the law. Courage and weigh well.

[Emphasis added.]

■ Like comments on the need to protect society from defendant's future crimes, remarks implying that jurors will violate their oaths if they fail to convict or return a death sentence are improper. *See Rose, supra,* 112 *N.J.* at 521, 548 *A.*2d 1058 (citing *United States v. Young,* 470 *U.S.* 1, 30, 105 *S.Ct.* 1038, 1053, 84 *L.Ed.*2d 1, 22 (1985) (Brennan, J., concurring in part and dissenting in part) ("Many courts historically have viewed such warnings about not 'doing your job' as among the most egregious forms of prosecutorial misconduct")); *State v. Knight,* 63 *N.J.* 187, 193, 305 *A.*2d 793 (1973); *State v. Johnson,* 31 *N.J.* 489, 512–13, 158 *A.*2d 11 (1960). The State's argument that these comments were not designed to intimidate the jury but to convince them not to accept defendant's "invitation" to convict him of felony murder is without merit. Although the prosecution in a criminal case may use forceful language in summing up the State's case, *Johnson, supra,* 31 *N.J.* at 510, 158 *A.*2d 11, it may not, as here, explicitly tell the jurors that they are obligated by their oath to return a particular verdict. Such emotion-laden language poses "a significant risk that the jury [will] be diverted from its duty to determine defendant's punishment based on the evidence and in accordance with the trial court's charge." *Rose, supra,* 112 *N.J.* at 521, 548 *A.*2d 1058. It is tantamount, as defendant contends, to a deliberate attempt to intimidate the jury into returning verdicts of capital murder and of death.

D. *Derogatory References to Defendant*

■ The prosecutor also engaged in misconduct by making numerous derogatory references about defendant. In his opening statement during the guilt phase, the prosecutor called

defendant "a jackal," "a stranger to humanity," "a coward," and someone with "ice * * * where his heart should be." He repeated some of those comments during his guilt-phase summation and added the labels "liar [who] catches himself in his own coils," man in an "obscene disguise," and "twisted." Likewise during the penalty phase, the prosecutor characterized defendant as "a pale shadow of a man without that something along with flesh and blood that makes us what we are, without conscious [sic] and capacity for compassion and mercy," as well as "cold, calculated, implacably evil, almost the embodiment of evil that marks a stranger."

The State contends that the comments above were neither prejudicial nor derogatory, but rather a "characterization of the evidence." We disagree. By no stretch of the imagination can it be said that describing defendant as a "coward," "liar," or "jackal" is not derogatory. Prosecutors may fight hard, but they must also fight fair. It is not fair to employ degrading epithets such as "[a] cancer," and "parasite upon society," *Williams, supra,* 113 *N.J.* at 455, 550 *A.*2d 1172; "animal," *Darden, supra,* 477 *U.S.* at 180–81, 106 *S.Ct.* at 2471, 91 *L.Ed.*2d at 157; *State v. Wilson,* 57 *N.J.* 39, 50, 269 *A.*2d 153 (1970); "butcher boy," *State v. Siciliano,* 21 *N.J.* 249, 262, 121 *A.*2d 490 (1956); "young punk," *State v. Stewart,* 162 *N.J.Super.* 96, 102–03, 392 *A.*2d 234 (App.Div.1978); "hood," "punk," and "bum," *State v. Von Atzinger,* 81 *N.J.Super.* 509, 516, 196 *A.*2d 241 (App.Div.1963). We caution prosecutors, as we have in the past, "to be circumspect in their zealous efforts to win convictions." *Williams, supra,* 113 *N.J.* at 456, 550 *A.*2d 1172. Epithets are especially egregious when, as here, the prosecutor pursues a persistent pattern of misconduct throughout the trial.

### E. *Use of Hearsay Statements to Cross-examine Defense Experts*

Defendant argues that the prosecutor's improper reliance on hearsay evidence to cross-examine defense experts exposed the

jury to inadmissible and prejudicial information that deprived him of his constitutional rights to due process and to confront adverse witnesses. *U.S. Const.* amends. V, VI, and XIV; *N.J. Const.* of 1947 art. I, paras. 1 and 10. Defendant also asserts that the improper cross-examination injected unreliable information into his capital-sentencing proceeding in violation of the federal and state constitutions. *U.S. Const.* amend. VIII; *N.J. Const.* of 1947 art. I, para. 12.

■ During the penalty phase of defendant's trial, the defense presented two psychiatric experts, Dr. Seymour Kuvin and Dr. A.J. Visceglia. While cross-examining those witnesses, the prosecutor attacked their credibility by reference to documents on which they had not relied.

We addressed a similar challenge in *Rose, supra,* 112 *N.J.* at 499–501, 548 *A.*2d 1058. In *Rose,* the prosecutor questioned the defendant's experts about details of his record in high school, the army, and in jail. *Id.* at 499, 548 *A.*2d 1058. Those records, however, had not been admitted into evidence or relied on by defendant's experts. We held that those questions were improper because they were unrelated to the experts' opinions or to the material on which the experts had relied. Also, the questions were not based on evidence in the record, and the prosecutor made no proffer that he could prove the underlying events. *Id.* at 500, 548 *A.*2d 1058. Here, the prosecutor committed a similar error.

In response to the prosecutor's cross-examination, Dr. Kuvin stated that he had not seen defendant's "rap sheet," which had not been admitted into evidence. Nonetheless, the prosecutor persisted in cross-examining Dr. Kuvin about defendant's conduct while on parole as evidenced by that document:

Q. And you noted in your report, I believe, that he [defendant] had approximately ten juvenile dispositions, convictions for crimes. Is that correct?

A. So he said, yes. I didn't have his rap sheet.

Q. You didn't have his rap sheet?

A. Right.

Q. You don't know about his convictions for breaking and entering and larceny and things of that sort?

A. All I know is he had ten offenses.

\* \* \* \* \* \* \* \*

Q. And his adult record, you are aware of his adult record, besides the conviction for the murder, you are aware he was convicted also in 1981 of armed robbery. You are aware of that, are you not?

A. I know he's had several charges and several convictions. I know most of them are robberies. *I never saw his rap sheet, as I say.* I know it is not a savory record.

\* \* \* \* \* \* \* \*

Q. Are you aware that [the] robbery incident happened in March of 1981 and he had only been paroled in May of 1981 for a murder conviction?

A. No, I'm not aware of that.

\* \* \* \* \* \* \* \*

Q. And are you aware that he was paroled on the armed robbery charge in 1985 and a short time after that murdered Arlene Connors?

A. I don't know the circumstances, you know, the parole or whatever.

\* \* \* \* \* \* \* \*

Q. Now do you also know about that time that he committed the armed robbery in 1981 while he was on parole for the murder that—

[Emphasis added.]

Defense counsel's objection at that point was overruled.

Although the trial court correctly concluded that evidence of defendant's prior convictions would be admissible to impeach the credibility of defense witnesses, *Evid.R.* 47, the court specifically limited the prosecution to use of the *fact* of such convictions. *Evid.R.* 4. The prosecution exceeded that limitation by referring to parole documents that had not been reviewed by Dr. Kuvin and that were not admitted into evidence. Once the witness testified that he had not relied on defendant's "rap sheet" in forming his opinion, the prosecutor should not have continued questioning him about defendant's conduct while on parole.

■ The prosecutor was equally persistent concerning medical reports from other physicians that Dr. Kuvin likewise had not reviewed:

Q. \* \* \* Now, those psychiatric opinions that I asked you about, which found that he's manipulative and that he lies to feign mental illness when he gets in trouble, you are aware of them, are you not?

A. I'm aware of them. I don't agree.

Q. Let's go over them a little bit. Are you aware of Doctor Bird's evaluation of Mr. Pennington?

A. Which one is that?

Q. Doctor Bird?

A. Wait a minute.

Q. The clinical psychiatrist from New Jersey State Prison who evaluated him in 1975?

A. Where is it? What time?

Q. 1975.

A. *No, I don't have that one.*

 \* \* \* \* \* \* \* \*

Q. Okay. Let's go over this report a little bit, Doctor. \* \* \* In talking with him today, this is entirely all manipulation. He acted up in order to go to the Vroom Building because he was told he could escape from there. He did escape from the mental hospital in North Jersey after being a month in that institution. That's what Doctor Bird said. Is that correct?

A. Yes.

 \* \* \* \* \* \* \* \*

Q. Doctor, once again, "he may be a paranoid inadequate antisocial individual," and in fact, you have indicated he was a paranoid inadequate antisocial individual?

A. I also said he was paranoid and inadequate, yes.

Q. Absolutely. There is no question about that. Certainly, he seems to be able to manipulate. That's what it says in the report. Is that correct?

A. It does.

Q. "He plans here to work in the law library whereby he can work on his case. He does seem to have that type of personality and I think he's going to be a problem within the institution." It says it there. Isn't that correct?

A. It does.

Q. That's Doctor Bird's opinion as a clinical psychologist?

A. Yes, that is.

Q. You've had a chance to look over that?

A. *I haven't seen that one particularly,* but I've had a chance to see the others.

Q. In fact, he was a problem within the institution, wasn't he?

A. I don't know.

Q. Did you take a look at his prison records?

A. No.

[Emphasis added.]

Although defense counsel did not object, the trial court warned the prosecutor that his questioning was becoming inappropriate:

Now, I do not want a parade of other psychiatric reports that this Doctor either hasn't read or doesn't treat as part of his conclusions in his reports here. I've allowed you to go partway into this. I think that's more than far enough.

Now, if there are other psychiatric reports that this doctor considered, and on which he based his report, I can see that. But otherwise, I don't know why, if you want Doctor Bird's opinions in here, that Doctor Bird shouldn't be here and be subject to cross-examination just like any other psychiatrist.

The trial court then opened the next day's proceedings with a lengthy jury instruction limiting the uses to which the doctor's reports could be put:

During the cross examination of Doctor Kuvin, there were references to reports of other doctors, questions as to whether the doctor had considered these reports or not considered those reports and also references to certain things which it was stated that Mr. Pennington had done or had not done in the past.

Now, all of that was admitted only as solely for the—for whatever effect it may have on your evaluation of Doctor Kuvin's testimony. It was cross examination of Dr. Kuvin. The only significance it has is whatever significance you give it as it affects Doctor Kuvin's testimony; that is, for example, there were references to a report of a Doctor Bird. Doctor Bird's report is not evidence in this case of anything of a significant issue in the case other than the significance of whether or not Doctor Kuvin considered it, whether you think that matters or not, whatever affect you give to Doctor Kuvin's report as a result of Doctor Bird's report.

Let me see if I can simplify that a little bit. The only significance of any of these reports is whatever effect they may have on Doctor Kuvin's report. They have significance only to that extent and not as independent evidence of anything. Doctor Bird's report, as one example, is not evidence in the case. Nothing that was said in that report is evidence in the case. The only significance they have is whatever effect they may have on Doctor Kuvin's report, on Doctor Kuvin's considering any of these materials or not considering them.

I just use Doctor Bird as an example. There were other references to other reports and other acts. None of that is independent evidence of anything and it was admitted only and solely for whatever significance it may have as it affects Doctor Kuvin's report and your evaluation of Doctor Kuvin's report.

That will also be true today, incidentally, if we have another doctor testifying and if he should be cross examined about other doctors' reports and did he consider this or did he consider that, the significance of all of those questions are only and limited to whatever weight they may have on that doctor's

testimony. They are not independent evidence of any of the findings that it contains.

With the trial court's acquiescence, the prosecutor then used similar inadmissible hearsay in his questioning of Dr. Visceglia, the defense's second expert witness. Dr. Visceglia testified on direct examination that in 1984 he had recommended to the parole board at the New Jersey State Prison at Leesburg, where defendant was incarcerated at the time, that mandatory mental-health counseling be made a condition of defendant's parole. In an attempt to discredit the witness during cross-examination, the prosecutor relied on parole records never reviewed by the doctor and not admitted into evidence:

Q. Doctor, I'm going to ask you to take a look at S-82 which is entitled on the top page Certificate of Parole.

\* \* \* \* \* \* \* \*

So, Doctor, it does appear that [when] he [defendant] was paroled in 1985, the parole board took your recommendation. Isn't that correct?

A. That's correct, according to that statement.

\* \* \* \* \* \* \* \*

Q. \* \* \* Now, Doctor, as a result of your investigations in this case, you do know that he was paroled to a religious halfway house where he did receive intensive psychotherapy?

A. For how long, I need to know.

Q. Well, you don't know that?

A. No, I don't. You see, we have no follow-up. As far as we're concerned, once they are paroled, the situation is out of our hands as professional staff at the prison.

The prosecutor then questioned the doctor on information contained in other reports also not admitted into evidence:

Q. \* \* \* [Y]ou weren't familiar with Robert Davis' name either because you didn't read those reports?

A. No.

Q. Okay. With respect to those reports though, from 1974 and specifically with your statement that, you know, if there is a person with whom he can relate to, to turn him around, you might be able to turn him around, are you aware that at the time he killed Robert Davis, according to those reports, he had been living for six years with Linwood Allen, his mother's common law husband, and had a very warm relationship with him?

A. I wasn't aware of that.

Q. But that would be relevant?

A. It could be, yes.

Q. It could be.

When defense counsel objected, the trial court instructed the jury to disregard the information:

> I will sustain [defense counsel's] objection to the last question and the jury will please not consider any reference to any statement made in that report which is not in evidence concerning any relationship or non-relationship which Mr. Pennington may have had or may not have had with an individual named in that report which is not in evidence and should not be considered by you.

Experts may be required on cross-examination to disclose the underlying facts or data on which they relied. *Evid.R.* 57. When an expert has not relied on hearsay evidence, however, it may not be employed on cross-examination. *Rose, supra,* 112 *N.J.* at 499–500, 548 *A.*2d 1058. The same result obtains under the Federal Rules of Evidence. *Fed.R. Evid.* 705; *United States v. Dyer,* 752 *F.*2d 591, 593 (11th Cir.1985); *Blevins v. Cessna Aircraft Co.,* 728 *F.*2d 1576, 1579 (10th Cir.1984), *cert. dismissed,* 468 *U.S.* 1228, 105 *S.Ct.* 32, 82 *L.Ed.*2d 923 (1984); *Bobb v. Modern Prods.,* 648 *F.*2d 1051, 1055–56 (5th Cir.1981); *Bryan v. John Dean Div. of F.M.C. Corp.,* 566 *F.*2d 541, 545–47 (5th Cir.1978).

On remand, we caution the prosecutor not to cross-examine defendant's experts about the details of documents on which the experts did not rely. The prosecutor may elicit whether the expert relied on any such evidence, but in the face of a denial, may not use the details of those documents as the basis of further cross-examination.

## F. *Reference to Defendant's Future Dangerousness*

In his penalty-phase summation, the prosecutor also urged the jury to impose the death penalty on defendant because "he'll kill again." Specifically, the prosecutor said:

> In the end, because they can't abandon common sense entirely, these mental health experts tell us what we already knew: That Frank Pennington knows right from wrong; that he's of average, normal intelligence, knows what he's doing, knew what he was doing when he killed Arlene Connors; that he's Hedonistic [sic], selfish, self-centered and violent; that he'll rob again if given the chance because that's what he's chosen to do; that he'll kill again if you provoke him by what he considers a dirty look, or by jossling [sic] him he'll kill again.

> And yet he [defense counsel] asks for thirty years' incarceration for Frank Pennington along [sic] chance to kill perhaps a prison guard, one of the inmates, another chance to cause sorrow and pain and shatter another family. How many chances will our patient, long suffering and merciful law give him?

Thus, the prosecutor urged that defendant was too dangerous to exist not only in society at large, but even in State Prison. Defendant asserts that these remarks were designed to lead the jury to conclude that only by voting to kill defendant could it protect the public, prison officials, and other inmates. As we have previously stated, in a capital case, remarks suggesting "the need to protect society from crime" constitute prosecutorial misconduct. *Ramseur, supra,* 106 *N.J.* at 321, 524 *A.*2d 188; *Rose, supra,* 112 *N.J.* at 520–21, 548 *A.*2d 1058. Future dangerousness—the likelihood that defendant will kill again—is not one of the enumerated aggravating factors to be considered when imposing the death penalty. By exhorting the jury that defendant must be put to death to deter him from committing homicidal acts, "the prosecutor's arguments focused the jury's attention on matters extraneous to the aggravating and mitigating factors established by the Legislature to channel the jury's deliberations in the penalty phase of a capital case." *Rose, supra,* 112 *N.J.* at 521, 548 *A.*2d 1058. The point of the prosecutor's remarks was to encourage the jury to impose the death penalty for reasons other than those approved by the Legislature. As the United States Supreme Court has declared, "any decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.' " *Booth, supra,* 482 *U.S.* at 508, 107 *S.Ct.* at 2536, 96 *L.Ed.* at 452 (citation omitted). By beseeching the jury to depart from the legislative guidelines, the prosecutor, in effect, sought the arbitrary imposition of the death penalty.

–IV–

## OTHER ALLEGED ERRORS

Defendant challenges the New Jersey death-penalty statute as violating the eighth amendment to the federal constitution.

We rejected that argument in *Ramseur, supra,* 106 *N.J.* at 166–69, 182–90, 524 *A.*2d 188, and *State v. Biegenwald,* 106 *N.J.* 13, 25–26, 524 *A.*2d 130 (1987), and reaffirm those holdings today. Defendant also argues as grounds for reversal that (1) the trial court's decision to permit the State to use his prior convictions to impeach his credibility was an abuse of discretion; (2) two prospective jurors were erroneously excused for cause based on their views regarding the death penalty; (3) he was denied the right to effective assistance of counsel; (4) the jury instructions permitting him to be convicted of purposeful or knowing murder were a constructive amendment to the indictment; (5) the penalty-phase jury instructions were constitutionally defective; (6) the jury's failure to find two of three proposed mitigating factors was contrary to the weight of the evidence; and (7) his sentence is disproportionate relative to the penalties imposed on other defendants convicted of similar crimes. Because we reverse defendant's conviction due to the *Gerald* violation, we need not discuss these points in detail. For purposes of retrial, however, we make the following observations.

## A. *Use of Defendant's Prior Convictions*

Defendant argues that the trial court abused its discretion by ruling that his 1982 armed-robbery conviction, his two 1982 burglary convictions, and his 1974 murder conviction were admissible for impeachment purposes. Alternatively, defendant invites us to adopt the "Connecticut rule" and require that a prior murder conviction be "sanitized" before admission into evidence. *See State v. Geyer,* 194 *Conn.* 1, 480 *A.*2d 489 (1984); *Commonwealth v. Richardson,* 674 *S.W.*2d 515 (Ky.1984); *State v. Olsan,* 231 *Neb.* 214, 436 *N.W.*2d 128 (1989). Sanitization means that the State would be permitted to disclose only that a defendant had an unspecified prior felony conviction, not that he or she had previously been convicted of murder. *Geyer, supra,* 194 *Conn.* at 16, 480 *A.*2d at 498 (suggesting sanitization of all convictions for crimes that do not directly

relate to credibility). *But cf. People v. Barrick*, 33 *Cal.*3d 115, 124, 654 *P.*2d 1243, 1248, 187 *Cal.Rptr.* 716, 721 (1982) (rejecting sanitization because it undermines jury's ability to assess credibility of witness).

We decline defendant's invitation. The well-established rule in this jurisdiction is that admission of a prior conviction "into evidence against a criminal defendant rests within the sound discretion of the trial judge * * *. Ordinarily evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant." *State v. Sands*, 76 *N.J.* 127, 144, 386 *A.*2d 378 (1978). Further, "[t]he key to exclusion is remoteness." *Ibid.* Remoteness involves both the passage of time and the nature of the offense. *Ibid.* "The trial court must balance the lapse of time and the nature of the crime to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant." *Id.* at 144–45, 386 *A.*2d 378.

"Sanitization" would mark a pronounced departure from the *Sands* rule, which has served well for twelve years. We are not persuaded to depart from *Sands* or to establish an exception for a prior murder conviction in a capital case. In so holding, we recognize the potential prejudicial effect in such a case of a prior murder conviction. That potential prejudice must be weighed against the countervailing consideration, however, that serious crimes should be given weighty effect. Moreover, even greater prejudice might ensue from jury speculation about the nature of a conviction for an unspecified crime. *See Barrick, supra*, 33 *Cal.*3d at 124–25, 654 *P.*2d at 1248, 187 *Cal.Rptr.* at 721. In a capital case, whether or not defendant testifies at the guilt phase, evidence of a prior murder conviction is admissible as an aggravating factor in the penalty phase. *N.J.S.A.* 2C:11–3c(4)(a); *Koedatich, supra*, 112 *N.J.* at 247, 548 *A.*2d 939. Because of the possibility of prejudice, however, admission of a murder conviction for impeachment purposes should be tempered, if defendant elects to testify, by an appro-

priate limiting instruction. *State v. Whitehead*, 104 *N.J.* 353, 359, 517 *A.*2d 373 (1986); *Sands, supra*, 76 *N.J.* at 142 n. 3, 386 *A.*2d 378. Admission on the penalty phase does not, of course, eradicate prejudice to a defendant who elects to testify on the guilt phase. To some extent, nonetheless, it diminishes the argument that sanitization would prevent the jury from hearing that the defendant had previously been convicted of murder rather than of an unspecified felony.

■ At the conclusion of the *Sands* hearing, the trial court decided to admit all four convictions for impeachment purposes. It admitted the 1982 robbery and burglary convictions because all three involved a lack of veracity and were not otherwise "remote." Although the 1974 murder conviction did not raise the same concerns about dishonesty and posed great potential prejudice to defendant, the court concluded that the conviction was a "serious crime" bearing on credibility within the meaning of *Sands* and that it was not "remote." Given defendant's extensive criminal record, which extended from 1964 to 1982, the court rejected defendant's argument to "sanitize" the conviction. *See Sands, supra*, 76 *N.J.* at 145, 386 *A.*2d 378.

We cannot say that the trial court abused its discretion in admitting the four convictions. Under *Sands*, the 1982 convictions for robbery and burglary, as crimes involving dishonesty, were properly admitted to impeach defendant's credibility. *Id.* at 144, 386 *A.*2d 378. The 1974 murder conviction was not excludable simply because it did not bear on defendant's veracity. *Sands* permits impeachment by conviction of any kind of crime, and serious crimes are given more weight than lesser crimes. *Ibid.* As the trial court found, the four convictions evidenced a pattern of illegality that extended over two decades. After carefully weighing the probative value and potential prejudice, the court properly concluded that the convictions were admissible.

B. *Dismissal for Cause of Prospective Jurors Kathleen Danaher and Norma Waldron*

Defendant asserts that prospective jurors Kathleen Danaher and Norma Waldron were improperly excused for cause based on the trial court's determination that their views against the death penalty would impair their ability to sit on the jury. More specifically, defendant contends that although Ms. Danaher indicated during questioning that she would follow her conscience over the law should the two conflict, no such conflict existed. In addition, defendant argues that although Ms. Waldron admitted that her views against the death penalty would substantially impair her ability to sit as a juror, that admission was in response to abusive questioning during *voir dire*.

The test for determining whether a prospective juror's views about capital punishment constitute cause for excusal is whether "those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980); *see Ramseur*, *supra*, 106 *N.J.* at 255, 524 *A.*2d 188. Under this test, a juror's bias for or against capital punishment need not be shown with "unmistakable clarity." *Ramseur*, *supra*, 106 *N.J.* at 256, 524 *A.*2d 188. Nor is it necessary to show that the gravity of the penalty would not affect the juror in any way. *Ibid.*

Trial courts possess "a sound measure of discretion" to evaluate the responses made by prospective jurors during *voir dire* and to determine whether an individual's bias with regard to the death penalty would substantially interfere with his or her functioning as a juror. *Ibid.; Wainwright v. Witt*, 469 *U.S.* 412, 425–26, 105 *S.Ct.* 844, 852–53, 83 *L.Ed.*2d 841, 852–53 (1985). We conclude that the trial court did not abuse that discretion by excusing the two prospective jurors.

The *voir dire* in this case was thorough and thoughtful. Each prospective juror was given a written questionnaire, which included questions pertaining to general occupational and

educational background, possible prejudice against defendant, and ability to sit. During *voir dire*, the trial court reviewed with prospective jurors any problematic answers. Then the court outlined the bifurcated capital proceeding and explained the legal principles applicable to the guilt and penalty phases. After that explanation, the court then asked each juror general questions about the death penalty, after which counsel were permitted to ask follow-up questions.

■ Turning to the two jurors in question, our review reveals a careful effort by the trial court to determine whether their views would substantially impair their ability to sit. Juror Danaher, for example, candidly admitted both to the court and to the prosecutor that she was opposed to the death penalty as a matter of "conscience," and that if the law conflicted with her conscience, she "would follow [her] conscience." As the court noted in deciding to excuse her for cause, "[t]here [was] really no question * * * that Miss Danaher made it clear more than once that given a conflict between the law as I explained it to her and her own conscience as she phrased it, she would without reservation follow her conscience rather than the law." We cannot find that the trial court abused its discretion in excusing this juror.

■ Likewise, it was within the trial court's discretion to excuse Ms. Waldron. On her *voir dire*, she answered affirmatively to a question on the written questionnaire asking whether there was any reason that she could not hear the case and decide it fairly. In response to further questions, Ms. Waldron explained that she did not believe in the death penalty "because there are so many cases that I've heard of or seen where, you know, innocent people go to jail and I wouldn't want to be responsible." She indicated further that she would prefer not to sit on the jury.

When the prosecutor asked Ms. Waldron whether her feelings about the death penalty were "so strong" that, at least in the penalty proceeding, they would impair her ability to func-

tion as a juror, she responded, "yeah, I would say that. * * * I don't know if I really could bring back a verdict of—to cause someone else's death." After outlining the law concerning the imposition of the death penalty, the court asked Ms. Waldron if she could return a death penalty under the circumstances it had described. She responded that she did not think she could. When the court rephrased the question in terms of whether her feelings against the death penalty would "substantially impair" her ability to return a death sentence, she responded, "I guess it would because of my strong feelings against the death penalty." Based on these responses, the trial court found "a substantial impairment of her ability to function as a juror and, therefore, she must be excused." Additionally, the court noted for the record that by the end of the *voir dire*, Ms. Waldron was "very distressed" and "weeping." Under the circumstances, we find that the trial court did not abuse its discretion in excusing her.

## C. *Ineffective Assistance of Counsel*

Defendant also argues that he was denied effective assistance of counsel because his attorney (1) failed to ask proper questions during *voir dire*, and (2) failed to exercise a peremptory challenge against prospective juror Connie Hollenbeck. Both these arguments are without merit.

As announced by the United States Supreme Court, the test for ineffective assistance is whether counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and whether defendant has been seriously prejudiced by those errors. *Strickland v. Washington*, 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984). Our formulation is substantially the same, and "if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987).

■ As a matter of both state and federal law, if counsel's performance has been so incompetent as to make "the idea of a fair trial a nullity, no prejudice need be shown." *State v. Davis*, 116 *N.J.* 341, 352, 561 *A.*2d 1082 (1989); *see also United States v. Cronic*, 466 *U.S.* 648, 658, 104 *S.Ct.* 2039, 2046, 80 *L.Ed.*2d 657, 667 (1984) (noting that under certain circumstances, prejudice is so likely that a case-by-case evaluation of prejudice is not cost effective). If counsel's performance has been so deficient as to constitute the constructive denial of the right to counsel, prejudice will be presumed. *Strickland, supra*, 466 *U.S.* at 692, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d at 696; *Davis, supra*, 116 *N.J.* at 352, 561 *A.*2d 1082.

We have declined, however, to adopt a special standard for ineffective assistance of counsel in capital cases. As we stated in *Davis*, "[t]o judge capital defendants differently would effectively diminish the rights of noncapital defendants, a disquieting result * * *." 116 *N.J.* at 356, 561 *A.*2d 1082. Applying the *Fritz/Strickland* test to this case, we conclude that defense counsel has not been shown to have been incompetent. See *Strickland, supra*, 466 *U.S.* at 697, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699 (noting that courts need not address "both components of the inquiry if the defendant makes an insufficient showing on one").

■ Under our Rules, the primary responsibility for the conduct of *voir dire* rests with the trial court. *R.* 1:8–3. Attorney-conducted *voir dire*, although to be encouraged in a capital case, is not constitutionally compelled. *Biegenwald, supra*, 106 *N.J.* at 30, 524 *A.*2d 130; *see State v. Zola*, 112 *N.J.* 384, 395, 548 *A.*2d 1022 (1988). As previously noted, the trial court carefully sought to select a fair and impartial jury. Defendant's argument is that counsel's failure to ask follow-up questions was so unreasonable as to deny him the effective assistance of counsel.

■ The argument focuses on a statement by counsel on the fourth day of jury selection in which he was arguably confused

whether questions were to be posed concerning the jurors' general qualifications as distinguished from their "death-qualification," or ability to decide a case in which the State was seeking the death penalty. Defendant now contends that trial counsel's belief that the sole purpose of the *voir dire* was to determine death qualification somehow precluded counsel from pursuing whether the views of certain jurors affected their ability to sit on a death-penalty case. Yet, the purpose of death qualification is to resolve that issue. Consequently, we cannot follow defendant's logic that counsel's belief affected the selection of jurors who were free from bias on the imposition of the death penalty.

Our review of the record reveals, moreover, that defense counsel may have limited his questions as a matter of trial strategy. One juror, Ethel Kenyon, indicated on questioning by the prosecutor that she would impose the death penalty if a murder was premeditated or the victim was particularly made to suffer. Because defendant's conduct apparently did not satisfy either condition, defendant may have declined asking further questions for strategic reasons.

Another juror, Martin Ruane, indicated that the death penalty would be appropriate under certain circumstances. In response to questioning by defense counsel, Mr. Ruane indicated that he would follow the law as charged by the court. The argument that counsel did not pursue more vigorous questioning because of a failure to understand the scope of *voir dire* is singularly unpersuasive concerning Mr. Ruane because his *voir dire* did not take place until four days after the trial court informed counsel that he should include within his questions not only death qualification, but more general matters.

An alternate juror, Joan Zajicek, indicated that she favored the death penalty if she were convinced "beyond a shadow of a doubt that someone actually committed a crime in violence, not in passion * * *." She also indicated in response to questions by defense counsel, however, that she realized the death penal-

ty was not imposed in every capital case and that she would consider the alternative of imprisonment. Like Mr. Ruane, Ms. Zajicek indicated an unequivocal willingness to follow the law as instructed by the trial court. *Cf. Williams, supra,* 113 *N.J.* at 445, 550 *A.*2d 1172 (finding reversible error when that court failed to excuse for cause a prospective juror who admitted that she would disregard the court's instructions and automatically impose the death penalty on a defendant convicted of murder).

As a matter of trial advocacy, jury trials are as much an art as a science. A trial lawyer must adopt a style suited to his or her personality and the circumstances of the case. Perhaps a more aggressive lawyer would have tested in greater detail the circumstances that would have justified the imposition of the death penalty in the minds of these three jurors. From our reading of the record, counsel's performance was more than adequate.

█ Defendant's final ineffective-assistance argument is based on his counsel's failure to excuse juror Connie Hollenbeck. Initially that juror stated that she expected defendant to prove his innocence and to testify. The court explained that the State bore the burden of proving defendant's guilt beyond a reasonable doubt and that defendant was not obliged to prove his innocence or to testify. In response to clarifying questions from the court and from defendant's counsel, Ms. Hollenbeck stated that she would follow the court's instruction that defendant "has no burden to prove anything and doesn't have to testify if he doesn't want to * * *." She also said that she believed in the death penalty, but that it was "a difficult question" for her. From this, defendant argues that his counsel was so lacking in judgment in not excusing Ms. Hollenbeck that his performance fell below the standard of reasonable competence. We disagree. Trial counsel, who observed the juror's demeanor, could have concluded that the juror had been rehabilitated by the questioning of the court and counsel. The juror's statement that she believed in the death penalty is

consistent with the public policy of this state as pronounced by the Legislature. Her statement that she found it to be "a difficult question" could have redounded to defendant's benefit. Ms. Hollenbeck also stated that she believed in psychology—an important consideration for the defense, which relied on psychiatric testimony in the penalty phase—and that she would follow the court's instruction whether that would lead to the penalty of death or of imprisonment. Nothing in the record justifies the conclusion that counsel's failure to excuse Ms. Hollenbeck constitutes ineffective assistance.

### D. *Court's Correction of the Form of the Indictment*

The first count of the indictment charged that defendant "did by his own conduct, purposely *and* knowingly cause the death or serious bodily injury resulting in death of ARLENE CONNORS; contrary to the provisions of N.J.S. 2C:11-3a(1) and (2) * * *." (emphasis added). Under the statute, however, criminal homicide constitutes murder when the actor purposely, *N.J.S.A.* 2C:11-3a(1), *or* knowingly causes death or serious bodily injury resulting in death, *N.J.S.A.* 2C:11-3a(2) (emphasis added).

At the charge conference, defense counsel urged that the State was obliged to prove that the homicide was both knowing *and* purposeful. The court observed that the mistake in the indictment was simply the result of inartful pleading. Consequently, it charged the jury that "[t]he State can meet its burden in this case if it shows to your satisfaction that Mr. Pennington acted purposely *or* knowingly. It doesn't have to show both." (emphasis added). In so charging, the court was clearly correct. As the court concluded, under *N.J.S.A.* 2C:11-3a(1) and -3a(2), the only offenses constituting murder are homicides that are either purposeful *or* knowing, but not both.

Defendant now contends that the charge constituted a substantive amendment to the indictment in violation of his right to indictment under article I, paragraph 8 of the New

Jersey Constitution. We disagree. The amendment was one of form. *R.* 3:7–4. Nor did the amendment prejudice defendant. His trial strategy was that the shooting was neither knowing nor purposeful, but accidental. That strategy would have been the same even if the indictment had been stated in the disjunctive, rather than the conjunctive. On remand, defendant is on notice that the homicide constitutes murder when it is either purposeful or knowing.

## E. *The Penalty Phase Jury Instructions*

Defendant contends that the penalty-phase jury instructions were constitutionally defective in three respects: (1) they failed to define the mitigating factors; (2) they failed to apprise the jury that it must find that death is fitting and appropriate punishment; and (3) they failed to explain that more than one mitigating factor could be found based on the same evidence.

### 1. Failure to Define the Mitigating Factors

Defendant alleged three mitigating factors during the penalty phase of trial: (1) that he was under extreme emotional or mental disturbance at the time of the murder, *N.J.S.A.* 2C:11–3c(5)(a); (2) that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired as the result of mental disease or defect, *N.J.S.A.* 2C:11–3c(5)(d); and (3) that there were other factors relevant to his character or record or the circumstances of the offense that justified mitigating his sentence, *N.J.S.A.* 2C:11–3c(5)(h). He now argues that the trial court's definition of the first two factors was inadequate because the court merely read the applicable statutory language without further explanation. Concerning the "other factors," defendant asserts that the court did not instruct how the evidence might mitigate defendant's sentence. Our review of the record, however, reveals that the court undertook to explain those factors in light of the circumstances of the case.

The trial was held before our decision in *State v. Bey (II)*, 112 *N.J.* 123, 548 *A.*2d 887 (1988), in which we discussed sentencing procedures required in capital cases. In *Bey II*, we held that it was insufficient to read the statutory language when describing mitigating factors. The trial court's duty is "to assure that a reasonable juror will understand the meaning and function of [the] mitigating factors." *Id.* at 169, 548 *A.*2d 887; *see Williams*, 113 *N.J.* at 457, 550 *A.*2d 1172. Even without the benefit of *Bey II*, the trial court undertook to explain the general meaning of the mitigating factors and the particular factors relied on by defendant. 112 *N.J.* at 170, 548 *A.*2d 887. Concerning the general meaning of the mitigating factors, the court stated:

> [A] mitigating factor * * * is something which in fairness or mercy can be considered as extenuating or mitigating or reducing or lessening in some way the degree of blame or the degree of moral culpability. The circumstance[s] which in your human experience may warrant the exercise of compassion, mercy, sympathetic understanding, or which for any other reason may move you to conclude that prison for at least thirty years is a more appropriate sentence here than death.
>
> Any sympathy or compassion or mercy, if you will, which you may feel for any of these mitigating factors can be taken into consideration by you in coming to your decision as to the appropriate penalty but please be aware that the sympathy and compassion I'm speaking of is something which arises from consideration of the mitigating factors involved, not some vague and unchanneled sympathy which has nothing to do with any of those facts.

Concerning defendant's claim that he was under extreme emotional or mental disturbance at the time of the murder, *N.J.S.A.* 2C:11–3c(5)(a), the court distinguished that factor from the insanity defense and reviewed its previous definition of mitigating factors. Without summarizing the evidence, the court then instructed the jury to consider the evidence presented by both sides. Thus, the court did more than simply read the statutory definition of this factor.

As to the second alleged mitigating factor, that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired as the result of mental defect or disease, *N.J.*

*S.A.* 2C:11–3c(5)(d), the trial court again emphasized that this factor differs from the insanity defense and again instructed the jury to consider all the evidence submitted by both sides. In discussing whether "any other" factors would mitigate defendant's penalty, *N.J.S.A.* 2C:11–3c(5)(h), the court noted that the jury could consider defendant's childhood, family, upbringing, military record, and "anything else * * * deem[ed] appropriate." Thus, unlike the trial courts in *Bey II* and *Williams,* the court sought to explain the statutory definitions of the relevant mitigating factors. On retrial, the court would be well-advised to provide a more detailed explanation "in understandable terms related to the evidence in the case." *Zola, supra,* 112 *N.J.* at 432, 548 *A.2d* 1022. As previously indicated, however, the charge was adequate.

2. Failure to Apprise the Jury that It Must Determine Whether Death is an Appropriate Penalty

In *Bey II,* this Court stated:

Each juror must decide whether the law requires that the defendant must be put to death. Accordingly, the court's instructions must communicate to the jury that a death verdict is not the product of a mechanical application of the statute, but a reflection of the jury's normative judgment that death is "the fitting and appropriate punishment." Jurors are not mere fact finders, but the ultimate determiners of whether the defendant shall live or die.

[112 *N.J.* at 162–63, 548 *A.2d* 887 (citations omitted).]

Defendant alleges that because the trial court did not convey to the jury a "true sense" of its responsibility for determining whether a death sentence should be imposed, the penalty-phase jury instructions did not satisfy the *Bey II* requirements. The court stated:

Please understand that in this final step of your deliberations, the weighing of aggravating and mitigating factors, that process is not simply a mechanical process, nor does it necessarily or simply depend on the number of factors on each side. It depends on your careful and considered judgment.

It is a judgment being made by you based, however, on those aggravating and mitigating factors. It represents your judgment that having considered, evaluated and weighed * * * those aggravating factors and mitigating factors, that on that basis you are satisfied, either satisfied beyond a reasonable doubt that the appropriate punishment here is death in which case it will be death; or

that you believe the appropriate punishment here is prison for at least thirty years without parole; or at least that you have reasonable doubt on that question in which case, as I said, the punishment will be prison and not death.

In our view, the trial court informed the jury of its ultimate responsibility to determine that death is the appropriate punishment. Contrary to defendant's assertion, these instructions adequately apprised the jury of the seriousness of its task.

### 3. Failure to Explain that More than One Mitigating Factor May be Found Based on the Same Evidence

▉ Defendant contends that the trial court erred in not explaining to the jury that the same evidence could support more than one mitigating factor. He bases this claim on *Bey II,* in which we allowed

the prosecution to use the same evidence in seeking to prove multiple aggravating factors, provided the trial court advises the jury that it should not simply compare the number of aggravating factors against the number of mitigating factors, that it is considering the same facts more than once, and that it should be cognizant that the same facts are being used to prove more than one aggravating factor.

[112 *N.J.* at 176, 548 *A.*2d 887.]

Defendant submits that the same principle should apply to mitigating factors. The point is raised as a matter of plain error. See *R.* 2:10–2.

Defendant's concerns are distinguishable from those of the defendant in *Bey II.* There, defendant was concerned that he would be prejudiced because the same evidence would support two aggravating factors instead of one. Here, defendant's concern is that the jury might not have realized that the same evidence could have supported two mitigating factors. Because the court did not charge that the same evidence could be used to support more than one mitigating factor, defendant is concerned that the jury might have felt obliged to select between two mitigating factors. Specifically, defendant maintains that *N.J.S.A.* 2C:11–3c(5)(a), referring to defendant's extreme emotional mental disturbance, overlaps *N.J.S.A.* 2C:11–3c(5)(d), referring to defendant's inability to appreciate the wrongfulness

of his conduct or to conform his conduct to the requirements of the law due to a mental disease or defect. Because we are reversing the imposition of the death penalty on other grounds, we need not determine whether the court committed plain error in failing to charge as defendant suggests. We agree, however, that the same psychiatric evidence was presented to support both mitigating factors. On remand, the court should instruct the jury that the same evidence may be used to prove multiple mitigating factors, and "that it should be cognizant that the same facts are being used to prove more than one factor." *Bey II, supra,* 112 *N.J.* at 176, 548 *A.*2d 887.

### F. *Jury's Failure to Find Two Mitigating Factors*

Defendant argues that the jury's failure to find that he was under the influence of extreme mental or emotional disturbance at the time that he shot Arlene Connors, *N.J.S.A.* 2C:11–3c(5)(a), and its failure to find any other factors justifying a non-capital penalty under the "catch-all" factor, *N.J.S.A.* 2C:11–3c(5)(h), was contrary to the weight of the evidence. Because we reverse defendant's conviction on other grounds, it is not necessary to determine the sufficiency of those findings.

### G. *Disproportionality of Sentence*

Similarly, we do not reach defendant's final ground for attacking his death sentence, that it is "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3e. Because we reverse defendant's conviction on other grounds, it is unnecessary to undertake a proportionality review in this case.

Defendant's conviction for capital murder is reversed, and the matter is remanded to the Law Division.

HANDLER, Justice, concurring in part and dissenting in part.

In this capital case, defendant, Frank Pennington, killed a tavern owner, Arlene Connors, with a single shot from a

handgun during the course of a robbery. Defendant admits that he was committing a robbery when he pulled the trigger of the gun that killed his victim. Defendant was convicted of capital murder and sentenced to death. I concur in the judgment of the Court in reversing defendant's guilt conviction and death sentence.

I agree with the Court that the instructions concerning homicide offenses were in error and require the reversal of the defendant's conviction for capital murder. *Ante* at 557, 575 A.2d at 820. I also believe there are other grounds that provide a basis for reversal. These relate to instances of prosecutorial misconduct occurring in both the guilt and penalty phases; improper cross-examination leading to the admission of hearsay evidence; and the treatment of so-called "other crimes" and "prior crimes" evidence affecting both the guilt and penalty phases of the trial.

I write separately to explain more fully what I consider to be the correct analysis of those issues. I also repeat my continuing belief that the Capital Murder Act, *N.J.S.A.* 2C:11–3 is unconstitutional, as enacted, as construed, and as applied. Those reasons impel me to dissent from portions of the Court's judgment.

## I.

The Court recognizes the difficulty of attempting to parse evidence surrounding a killing into separate categories of homicides. It observes:

> In deciding to instruct the jury on aggravated and reckless manslaughter, the trial court concluded that "there is evidence on which the jury could accept a version which, either the gun went off accidentally or the gun went off as an, almost, reflective [sic] reaction after Mrs. Connors threw the glass or drink at Mr. Pennington." *Cf. State v. Rose*, 112 *N.J.* 454, 482 [548 *A.2d* 1058] (1988) (rejecting defendant's argument that jury should have been charged on aggravated manslaughter because evidence indicated shooting was volitional). We agree and conclude that if the evidence was sufficient to support a manslaughter verdict, it could likewise support a finding that defendant intended to cause

only serious bodily injury. As a result, the determination of defendant's precise intent is best left to the jury.

*Crisantos, supra,* 102 *N.J.* at 284 [508 *A.*2d 167] (O'Hern, J., concurring in part and dissenting in part). Indeed, the care taken by the trial court in constructing its charge leads us to conclude that had *Gerald* been decided before the trial of this matter, the court would have conformed its charge to that opinion. Because the court did not instruct the jury in accordance with *Gerald,* however, we reverse defendant's conviction and remand the matter for retrial.

[*Ante* at 562–563, 575 *A.*2d at 823.]

The Court thus correctly determines the standard prescribed by *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), was not satisfied.

Much of the evidence defendant asserts as supporting a serious-bodily-injury murder actually derives from the contention that the shooting was reckless. The trial court felt there was sufficient evidence in this case to charge the jury on the lesser-included offenses of aggravated manslaughter and reckless manslaughter. It may be that "[h]aving rejected aggravated manslaughter and manslaughter as optional verdicts, the jury concluded that defendant's state of mind was purposeful or knowing, not reckless." *Post* at 560, 575 *A.*2d at 822 (Stein, J., dissenting). It is not tenable, however, to reason from that possibility to the conclusion that "[n]o evidence in this record suggests" a killing that meets the *Gerald* standard. *Ibid.* If the evidence was sufficient to support a manslaughter verdict, it could likewise support a finding that defendant intended to cause only serious bodily injury. As the majority observes, "[I]t is too fastidious to conclude that the evidence would not support a charge that defendant acted intentionally, but with the intent to cause serious bodily injury rather than death." *Ante* at 565, 575 *A.*2d at 824. Further, it seems to me an oversimplification to believe that because the evidence as adduced in this case does not directly relate to a purposeful, as opposed to a reckless, assault, it is unsusceptible of generating a reasonable inference that the defendant also intended to cause harm, that is, no more than serious bodily injury and, therefore, is not entitled to a *Gerald* charge. *Post* at 556, 575

*A.*2d at 820 (Stein, J., dissenting). Maybe logic dictates that a person who acts "recklessly" with respect to another cannot simultaneously have an intent to hurt that person, but human experience does not compel that conclusion.

In any event, I do not think a court should determine as a matter of law whether homicidal conduct that falls short of a purposeful or knowing killing is necessarily and exclusively either a serious-bodily-injury homicide or a form of manslaughter. As I have remarked previously, the "distinction between knowledge and recklessness, between 'practical certainty' of a result and 'conscious disregard' of 'a substantial and unjustifiable risk' of a result, is a subtle one at best." *State v. Rose,* 112 *N.J.* 454, 562, 548 *A.*2d 1058 (1988) (Handler, J., dissenting). In cases where one cannot be truly certain whether the defendant intended to kill or intended to cause serious bodily injury, and where there is also evidence that the defendant may have acted recklessly, the Court should as it now does, let the distinction be "one for juries to draw deliberatively, not one for trial judges to draw preemptively." *Ibid.*

Moreover, it cannot be overemphasized that, in this pre-*Gerald* case, defendant had no reason at trial to prove that he intended only to cause serious bodily injury. In fact, he was attempting to establish exactly the opposite—that the shooting was not purposeful or knowing *in any way.* Unaware of the *Gerald* standard, the defendant certainly would not have introduced evidence supporting this theory. He should not now be penalized for failing to have done so.

I therefore agree with the Court that the evidence in this case warranted a *Gerald* charge and that defendant's conviction must be set aside on this ground. I would, however, require the court to present to the jury the full range of possible homicide offenses.

## II.

At the penalty phase, the defense presented the expert testimony of Dr. Seymour Kuvin, a psychiatrist, and Dr. J.A.

Visceglia, a psychologist. During cross-examination of these experts, the prosecutor continually and improperly placed inadmissible hearsay before the jury. Under the guise of impeaching their expert opinions, the prosecutor extensively questioned the doctors about hearsay materials including reports of other doctors and documents prepared by the Parole Board, which had not been relied on or even seen by those experts. Although defense counsel objected repeatedly, the court sustained few of his objections. As a result, the jury was exposed to inadmissible and highly prejudicial information.

On this point, the Court concludes simply that "[o]n remand, we caution the prosecutor not to cross-examine defendant's experts about the details of documents on which the experts did not rely. The prosecutor may elicit whether the expert relied on any such evidence but, in the face of a denial, may not use the details of those documents as the basis of further cross-examination." *Ante* at 583, 575 *A.2d* at 835. I fail to see how the Court can content itself with this disposition in light of our decision in *State v. Rose, supra,* 112 *N.J.* 454, 548 *A.2d* 1058.

In *Rose,* the defendant maintained that the prosecutor's use of defendant's records from high school, the army, and jail to cross-examine the defense's psychiatric experts was improper because the records were not in evidence and the experts had not relied on them in formulating their opinions. The Court declined to reverse the sentencing proceeding because of defense counsel's failure to make a timely objection, also ruling that "whatever error may have occurred in permitting this line of cross-examination was not clearly capable of producing an unjust result." 112 *N.J.* at 499–500, 548 *A.2d* 1058.

In contrast, in this case defendant made repeated objections to the prosecutor's questioning. The trial court concluded, albeit too late, that his objections should be sustained. Moreover, the court's "curative" instruction did not neutralize the harm but rather perpetuated it. The court told the jury that while it could not view the various reports referred to by the

prosecutor as independent evidence, it could use those reports to evaluate the credibility of the expert opinions of Drs. Kuvin and Visceglia. Because neither expert had used those reports in formulating his opinion, however, it could not have been legitimately used by the jurors for that or any other purpose.

Clearly the prosecutor's questioning was improper, defendant's objections timely, the hearsay evidence prejudicial, and the court's remedial instructions insufficient. The Court should rule that this is one of many instances of prosecutorial misconduct in this case that justifies reversal.

### III.

Defendant contends that the trial court abused its discretion in ruling admissible for impeachment purposes four prior convictions. Defendant also claims, relying on *State v. Geyer*, 194 *Conn.* 1, 480 *A.*2d 489 (1984), that his prior murder conviction, if admissible at all, should have been "sanitized"—that is, that the only information that should have been disclosed was that defendant had an unspecified felony conviction.

Prior to trial, the trial court conducted a *Sands* (*State v. Sands*, 76 *N.J.* 127, 386 *A.*2d 378 (1978)) hearing to determine whether defendant's prior convictions were admissible to impeach defendant's credibility should he elect to testify. Those prior convictions consisted of a 1974 *non vult* plea to a first-degree-murder charge, on which he received second-degree sentences, and one robbery and two burglary convictions for which he received an aggregate ten-year sentence in 1981.

The trial court initially observed that under the controlling *Sands* decision, the robbery and the two burglaries dealt with offenses that relate to dishonesty and therefore had a direct bearing on defendant's credibility. With respect to the prior murder conviction, the court found that it was a "serious crime" bearing on credibility and not "remote," and, further, rejected the Connecticut sanitization rule.

The Court now affirms those rulings. It also states, dismissively, that we should not resort to "sanitization" because that "would mark a pronounced departure from the *Sands* rule, which has served well for twelve years." *Ante* at 586, 575 *A.*2d at 837. I believe, in the context of a capital-murder prosecution, the application of *Sands* to allow the prior murder conviction to be used for impeachment purposes is arbitrary, fundamentally unfair, and, to the extent it contributes to the imposition of the death penalty, cruel and unusual punishment.

*N.J.S.A.* 2A:81–12 governs the admissibility of prior convictions for impeachment purposes. In criminal trials, the admission of prior convictions is tempered by the interplay between the statute and *Evidence Rule* 4, which requires that evidence may be excluded if its potential for undue prejudice outweighs its probative worth. *State v. Whitehead,* 104 *N.J.* 353, 358, 517 *A.*2d 373 (1986). Understandably, the decision to admit a prior conviction for impeachment purposes rests within the "sound discretion" of the trial court, the exercise of which should not be disturbed absent a clear error in judgment. *State v. Sands, supra,* 76 *N.J.* at 144, 386 *A.*2d 378. Nevertheless, a capital-murder prosecution is unlike any other criminal prosecution and requires, in my view, a stricter and more critical review of such discretion when it involves the admission of a prior murder conviction for impeachment purposes in the trial to determine guilt. We have stressed in capital cases that other-crimes evidence must be weighed carefully. *State v. Ramseur,* 106 *N.J.* 123, 265–66, 524 *A.*2d 188 (1987). There is "widespread agreement that other-crime evidence has a unique tendency to turn a jury against the defendant." *State v. Stevens,* 115 *N.J.* 289, 302, 558 *A.*2d 833 (1989). A prior conviction has the same prejudicial potential.

The trial court in this case did engage in a weighing process under *Evidence Rule* 4, considering the possibility of prejudice to the defendant in admitting for impeachment purposes a crime similar to that for which he was currently being tried. The court also professed to take into consideration the fact that

this was a capital case. Nevertheless, in reviewing this determination, the Court is myopic in failing to recognize the evidentiary fallout from a prior murder conviction that is offered in the guilt-phase of a capital-murder prosecution for purposes of impeachment. The prejudice is self-evident, inescapable, and destructive.

Limiting instructions cannot neutralize the prejudice that emanates from the admission of a prior murder conviction in the course of the guilt trial in a capital-murder prosecution. It is naive to believe that a jury struggling to decide whether defendant intentionally committed murder would not be influenced by the knowledge that defendant had killed before, or realistically would consider the prior murder as indicative only of defendant's lack of truthfulness.

At the very least, if defendant's prior murder conviction is admissible for the purposes of impeachment, the trial court should "sanitize" the conviction by limiting the amount of information that the State could present to the jury concerning the prior murder. "Sanitization" is not a rule in this state. *N.J.S.A.* 2A:81–12 permits the State to prove defendant's prior conviction by examination "or otherwise," including a record of the conviction. Production of the record, as permitted by statute, allows the State to show the nature of the crime, not just the fact of conviction. This Court has construed the statute to allow proof by way of cross-examination of the "factual components" of the prior conviction, which can include the nature of the crime. *State v. Thomas,* 76 *N.J.* 344, 361, 387 *A.*2d 1187 (1978).

Nevertheless, we have recognized that in a capital-murder prosecution a defendant is entitled to enhanced protection. *See State v. Ramseur, supra,* 106 *N.J.* at 324, 524 *A.*2d 188. Consistent with this imperative of assuring maximum protection, the Court should, with respect to prior murder convictions offered for impeachment purposes, bar the practice of disclosure of the nature of the offense. Neither the statute nor any

other rule of procedure dictates that practice. The Court should follow the approach of the Connecticut courts. Connecticut appears to use the sanitization process only when the prior conviction falls into the category of a crime not directly reflecting on credibility. *See State v. Crumpton,* 202 *Conn.* 224, 520 *A.*2d 226 (1987) (robbery); *State v. Harrell,* 199 *Conn.* 255, 506 *A.*2d 1041 (1986) (robbery with violence); *State v. Anderson,* 16 *Conn.App.* 346, 547 *A.*2d 1368 (conspiracy to commit robbery), certif. den. 209 *Conn.* 828, 552 *A.*2d 433 (1988); *State v. Thomas,* 15 *Conn.App.* 197, 543 *A.*2d 1356 (1988) (burglary convictions (3) and larceny conviction); *State v. Garcia,* 7 *Conn.App.* 367, 509 *A.*2d 31 (1986) (conspiracy to make extortionate extension of credit); *State v. Johnson,* 4 *Conn.App.* 672, 496 *A.*2d 522 (1985) (larceny); *cf. State v. Wright,* 198 *Conn.* 273, 502 *A.*2d 911 (1986) (abuse of discretion to admit prior manslaughter and assault convictions); *State v. Carter,* 189 *Conn.* 631, 458 *A.*2d 379 (1983) (abuse of discretion to admit prior sexual-assault conviction). These types of crimes, such as the violent crime in this case, tend to reflect adversely on defendant's general character rather than credibility. The Connecticut Supreme Court suggests that such convictions be referred to as "an unspecified crime" or "crimes carrying a penalty of more than one year." In this way, a defendant could be impeached without being subjected to the extraordinary prejudice that follows if the prior crime was specifically named or described. *State v. Anderson, supra,* 547 *A.*2d at 1370.[1]

I believe that a failure to take such an approach violates a defendant's entitlement to due process and fundamental fairness. The admission of the conviction in the guilt phase of a capital-murder prosecution is fundamentally unfair in part because it also serves as an aggravating factor in the sentencing phase. It is overreaching for the State to use the murder

---

[1]Other courts have refused to follow the rule of "sanitization." *See, e.g., People v. Barrick,* 33 *Cal.*3d 115, 187 *Cal.Rptr.* 716, 654 *P.*2d 1243 (1983); *People v. McBride,* 413 *Mich.* 341, 319 *N.W.*2d 535 (1982).

conviction to impeach credibility during the guilt phase—with the inevitable concomitant prejudicial effect of impugning defendant's character—and then use the conviction as an aggravating factor. This, in effect, constitutes a double use of the same evidence to prove a single factor. *See State v. Williams*, 113 *N.J.* 393, 453, 550 *A.*2d 1172 (1988) (improper evidence in guilt phase may affect jury's judgment in penalty phase). This is different from the use of evidence that has a direct probative bearing on establishing an element of the crime of murder. *See Ramseur*, 106 *N.J.* at 188, 524 *A.*2d 188 (permissible to use evidence of payment for murder as substantive evidence of guilt and death eligibility and as an aggravating factor in determining sentence). Moreover, this is different from the use of a prior conviction as an independent aggravating circumstance in ordinary criminal matters when it was also used in the guilt phase for impeachment purposes, *see, e.g., N.J.S.A.* 2C:43–7, 2C:44–3 (prior conviction used to impose extended term); *N.J.S.A.* 2C:44–1(e) (prior conviction used to defeat presumption of non-incarceration), because we are here concerned with murder convictions in the context of a prosecution seeking to impose the death penalty.

Further, the admission of the prior murder conviction for the purpose of impeachment violated defendant's right to due process by forcing him into a dilemma about whether to testify. This Court in *State v. Sands, supra,* expressly rejected a due-process challenge to the use of a prior conviction. We based that rejection upon the following observation:

> "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject-matter of his direct examination. &ast; &ast; &ast; It is not thought overly harsh in such situations to require that the determination whether to waive the privilege takes into account the matters which may be brought out on cross-examination. It is also generally recognized that a

defendant who takes the stand in his own behalf may be impeached by proof of prior conviction or the like. * * * Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify."

[76 *N.J.* at 142–43 n. 4, 386 *A.*2d 378 (quoting *McGautha v. California,* 402 *U.S.* 183, 212–215, 91 *S.Ct.* 1454, 1469–1471, 28 *L.Ed.*2d 711, 729–731 (1971)).]

A defendant in a capital-murder prosecution, however, should have enhanced protection with respect to the right to testify in order to defend against the charge of capital murder. That right should not be encumbered by the prospect of the admission of a prior murder conviction that at best could bear only on credibility, not substantive guilt, and, at worst, could seriously be considered as evidence of defendant's homicidal character.

Under the circumstances of this case, it was fundamentally unfair of the trial court not to take the "option" of admitting only the robbery and two burglaries and excluding the murder conviction for impeachment purposes, or, alternatively, sanitizing the murder conviction in order to limit its use solely to impeachment purposes. These considerations would justify a reversal.

## IV.

Defendant contends that, during the guilt phase of the trial, the prosecutor deliberately attempted to make the jury aware of other crimes allegedly committed by the defendant—crimes that had been ruled inadmissible. The Court discounts this issue. *Ante* at 574–576, 575 *A.*2d at 830–831. I would rule that the handling of this evidence constituted reversible error.

Prior to trial, the prosecutor made a motion to introduce evidence that an hour after the shooting of Arlene Connors, defendant committed another robbery at a nearby convenience store. The ostensible purpose was to have the store clerk identify the maroon sweatshirt defendant wore that night—the same shirt that revealed no blood stain when subject to analysis. The court denied that motion based on *Evidence Rule* 55

and *Evidence Rule* 4 grounds. In addition, just prior to the testimony of Mary Claire Pennington, the court cautioned the prosecutor that there was to be no questioning with respect to the second robbery. Nevertheless, such questioning occurred during the examination of Mrs. Pennington. The testimony that was elicited was also mentioned by the prosecutor in his guilt-phase summation.

The prosecutor thus attempted to persuade the jury that defendant was a "professional criminal" by insinuating that he had before used the gun with which he killed Arlene Connors despite the lack of any evidence supporting such a statement. *See State v. Stevens, supra,* 115 *N.J.* at 302–03, 558 *A.*2d 833 (evidence of other crimes means: "once a crook, always a crook"). The prosecutor's tactic was clearly calculated to convince the jury that defendant acted deliberately rather than reflexively, after being startled by the victim's conduct.

The conclusion is unavoidable that the prosecutor's conduct both on the cross-examination of Mary Claire Pennington and during his guilt-phase summation was "clearly and unmistakably improper." *State v. Williams, supra,* 113 *N.J.* at 452, 550 *A.*2d 1172. The Court appears to agree. *Ante* at 575, 575 *A.*2d at 830. Nevertheless, the Court contents itself only with the mild observation that "the prosecutor's conduct was clearly inappropriate," *ibid.,* and fails to find reversible error. In my opinion the prosecutor's improper conduct substantially prejudiced defendant's right to have a jury fairly evaluate the merits of his defense and constituted reversible error.

## V.

The record is replete with other instances of prosecutorial misconduct. The record indicates that the prosecutor deliberately attempted to intimidate the jurors into returning verdicts of capital murder and death by insinuating that the law required a conviction for capital murder and by informing them that any other verdict would betray their oaths and render

them accomplices of the defendant in cowardice, lies, and deceit. The prosecutor stressed defendant's future dangerousness, and made numerous derogatory references to defendant during both the guilt and penalty phase. The Court notes these remarks. *Ante* at 572–573, 576–578, 584–585, 575 *A.*2d at 828–829, 831–832, 835–836. In dealing with defendant's claim that numerous instances of prosecutorial misconduct constituted reversible error, the Court observes merely that "[b]ecause we are reversing both the guilt and penalty verdicts on other grounds, 'we need not determine the likelihood that the prosecutor's misconduct led to an unjust verdict,'" quoting *State v. Williams, supra,* 113 *N.J.* at 446, 550 *A.*2d 1172. *Ante* at 565, 575 *A.*2d at 824. To this it adds: "[T]he prosecutor, if he did not cross the line of impropriety, came perilously close to committing reversible error," contenting itself with a precatory admonition, "to avoid problems on remand, we offer the following guidelines." *Ibid.* I cannot fathom the Court's timidity on this point. The prosecutorial misconduct clearly warrants reversal of defendant's conviction and sentence.

The prosecutor strategically and consistently injected into the case the character, background, and social worth of the victim, as well as the grief suffered by her family because of her death. The prosecutor elicited such evidence through the direct examination of Pam and Tommy Connors. Further, the prosecutor made dramatic use of this testimony during the guilt-phase summation, evidencing a calculated plan to engender sympathy for the victim and grieving family members. He suggested that defendant's attempt to prove he was guilty of felony murder rather than purposeful-knowing murder denigrated the memory of Arlene Connors. He invited the jury to find defendant guilty of purposeful and knowing murder rather than felony murder because Arlene Connors was "flesh and blood," because she was "loved," because of the grief that Tommy Connors so obviously experienced as he testified, and because to do otherwise would be to "insult" and "dishonor"

Arlene Connors' memory and deprive "Arlene Connors and her family the dignity and the truth that they deserve as human beings." The jury's acceptance of defendant's story, the prosecutor said, would make them accomplices in defendant's lies and deceit.

This prosecutorial misconduct indisputably was in violation of *State v. Williams, supra,* 113 *N.J.* 393, 550 *A.*2d 1172. As we there noted, the prosecutor's comments during his opening and closing contained

> nothing that would aid the jury in determining the defendant's guilt or innocence. Rather, the inflammatory statements could likely result not only in unduly prejudicing the jury against defendant but also in confusing it over whether its deliberations should be influenced by the sterling character of the victim. There is no place in a capital case for such confusion and prejudice. The prosecutor's remarks were clearly improper and should have been stricken from the record and the jury properly instructed to disregard them.
>
> [*Id.* at 452, 550 *A.*2d 1172.]

It would also, I believe, violate the principles of *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987) and *South Carolina v. Gathers,* —— *U.S.* ——, 109 *S.Ct.* 2207, 104 *L.Ed.*2d 876, *reh'g den.,* —— *U.S.* ——, 110 *S.Ct.* 24, 106 *L.Ed.*2d 636 (1989), which prohibit, under the eighth amendment, a capital sentencing jury from considering victim impact evidence irrelevant to the sentencing process.

Further, the prosecutor's emphasis on defendant's future dangerousness violated the standards we laid down in *State v. Rose.* There the prosecutor similarly emphasized the importance of preventing the defendant from committing future acts of violence. 112 *N.J.* at 519–20, 548 *A.*2d 1058. The prosecutor also exhorted the jury to impose the death penalty in order to "send a message" to the community. *Id.* at 520, 548 *A.*2d 1058. This Court noted that statements by a prosecutor suggesting that the jury should impose the death penalty "in order to protect society from crime" improperly diverts the juror's attention from the facts of the case before them. *Ibid.* (citing *Ramseur,* 106 *N.J.* at 321, 524 *A.*2d 188). The Court held:

By urging the jury to sentence defendant to death in order to deter him from future acts of violence and to "send a message" to society that conduct such as defendant's will result in the death penalty, the prosecutor's arguments focused the jury's attention on matters extraneous to the aggravating and mitigating factors established by the Legislature to channel the jury's deliberations in the penalty phase of a capital case. Neither the likelihood that defendant would commit future crimes nor the benefit to society from sentencing to death persons convicted of capital murders is among the aggravating factors set forth in the Act. The emotional force to the prosecutor's arguments posed a significant risk that the jury would be diverted from its duty to determine defendant's punishment based on the evidence and in accordance with the trial court's charge. We conclude that these statements were improper and prejudiced defendant's penalty-phase proceeding.

[*Id.* 112 N.J. at 521, 548 *A.*2d 1058.]

Although the prosecutor in this case did not "send a message to the community," he clearly urged the jury to sentence defendant to death in order to prevent him from future acts of violence. Such conduct is clearly improper under *Rose*. *See also Darden v. Wainwright, supra,* 477 *U.S.* at 178–80, 106 *S.Ct.* at 2470–72, 91 *L.Ed.*2d at 156–57 (Supreme Court implied that comments "that the death penalty would be the only guarantee against a future similar act" were "undoubtedly improper"); *Ramseur, supra,* 106 *N.J.* at 321–24, 524 *A.*2d 188 (prosecutor committed misconduct, "when, in his summation in the penalty phase, he suggested that the jury's deliberations be influenced by the need to protect society from crime").

In addition, defendant alleges further misconduct in the prosecutor's "deliberate" disregard of the trial court's instruction concerning the scope of information that could be presented to the jury concerning the 1974 murder conviction. Thus, prior to the start of the penalty phase, the court held a hearing to determine what evidence the State would be allowed to submit to prove the "prior murder" aggravating factor. After reviewing the language of the statute, and its legislative history, the court ruled that the State could show the name and age of the victim, and the fact that defendant and the victim were acquaintances, not relatives. The prosecutor asked to be allowed to prove the details of the manner in which death was inflicted,

but the trial court limited him to a showing that the victim was shot twice with a shotgun.

Thereafter, the prosecutor and defense counsel agreed on a stipulation, which was ultimately read to the jury:

Frank Pennington, as a result of a plea, was found guilty of first degree murder February 19th, 1974, of the murder of Robert Davis, age thirty-three years. The autopsy of Robert Davis revealed that he had been shot with a shotgun in the back of his right thigh and in the right side of his head. Death was caused by the shotgun wound to the head, which lacerated the victim's brain. Mr. Pennington and Mr. Davis were not related.

Despite the trial court's ruling explicitly limiting the State's proofs on this factor, the prosecutor blatantly disregarded this stipulation and said in his penalty-phase opening, that defendant "took a shotgun in Newark, New Jersey, shot a young thirty-three year old man in the back of the leg with that shotgun and then blew away half his face." Despite the court reprimand that this remark elicited, the prosecutor once again flouted the trial court's ruling in his penalty-phase summation by saying that defendant "took a shotgun crippled another human being and shot him in the face." The prosecutor deliberately circumvented the scope of the trial court's ruling by making the crime appear as brutal as possible so the jury would assign it more weight.

If evidence and commentary are so inflammatory and emotional that it would distract the jury from its proper consideration of the appropriate capital sentencing criteria, in violation of constitutional strictures against cruel and unusual punishment, it would have the same pernicious capacity to warp a jury's deliberations on guilt. In *Williams*, we indicated that a prosecutor's remarks concerning victim impact evidence during the *guilt* phase of a capital case could "raise serious questions about whether the jury's judgment was 'suitably directed and limited' during the penalty phase." *Williams, supra,* 113 *N.J.* at 453, 550 *A.*2d 1172. The Court stated that

[i]t is constitutionally required that juries in capital trials reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary. Failure to purge successfully such comments from admittedly

emotion-charged proceedings creates the unacceptable risk that what will result
is the arbitrary and capricious imposition of the death penalty.

[*Id.* at 453–54, 550 *A.*2d 1172 (citing *Booth v. Maryland, supra,* 482 *U.S.* 496,
107 *S.Ct.* 2529, 96 *L.Ed.*2d 440).]

That occurred in this case. The Court cautioned prosecuting
attorneys in *Williams* that it was "prepared to take more
severe action as required to ensure that capital trials are
conducted without resort to improper remarks and questionable
tactics by the State's prosecuting attorneys." 113 *N.J.* at 456,
550 *A.*2d 1172. This is a case for the Court to take "severe
action" as warned. The prosecutor's remarks throughout the
trial were "clearly and unmistakably improper" and so egre-
gious as to constitute prosecutorial misconduct warranting the
reversal of defendant's conviction as well as death sentence.

## VI.

With these added reasons, I concur in part and dissent in part
from the judgment of the Court.

STEIN, Justice, dissenting.

The Court concludes that the evidence in the record provides
a rational basis for the jury to have determined that defendant
intended to cause serious bodily injury but not death. *Ante* at
562, 575 *A.*2d at 823. Accordingly, the Court reverses defen-
dant's conviction of capital murder because the trial court did
not instruct the jury in accordance with our opinion in *State v.
Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). Because the Court
remands this matter for a retrial of the capital-murder charge,
it does not resolve other issues in both the guilt and penalty
phases.

I disagree that the trial court's failure to instruct the jury in
accordance with *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d
792, constitutes reversible error, and would therefore proceed
to determine on the merits the remaining issues raised by
defendant. Although there is evidence in the record that would
have permitted the jury to convict defendant of aggravated

manslaughter, *N.J.S.A.* 2C:11–4(a), or manslaughter, *N.J.S.A.* 2C:11–4(b), crimes on which the jury was specifically instructed, I find no evidence in this record that affords a rational basis for a conviction of serious-bodily-injury murder. In my view, the jury's verdict necessarily constituted a determination that defendant purposely or knowingly caused the death of Arlene Connors, and any error in the charge was harmless beyond a reasonable doubt.

Many of the facts bearing on the circumstances of the homicide were undisputed. Immediately prior to the shooting the victim was standing behind the bar at Sarge's tavern, and defendant was seated opposite her on a bar stool. The bar was twenty-four inches wide and forty-two-and-one-half inches high. The murder weapon was a .32 caliber semi-automatic handgun. Its hammer had to be cocked and three safeties released before the weapon could be fired. Nine pounds of pressure were required to pull the trigger and fire a bullet. The bullet entered the victim's body in the upper, outer quadrant of the left breast. The cause of death was a massive laceration of the right ventricle of the heart, from which the victim bled to death.

Defendant admitted that on the evening of the homicide, he was driving around with his wife, specifically looking for a place to commit a robbery. He selected Sarge's as a "likely target," noting that it was in a quiet neighborhood. Once inside, he determined to go through with the holdup because there were few customers in the bar.

The disputed testimony at trial concerned the shooting itself. The victim's daughter, Pam Connor, testified that at about 1:00 a.m., she heard her mother say to defendant, "it's the bewitching hour," an expression she used to inform patrons that it was time to leave. Defendant replied, "bewitch this." Pam said she heard a "commotion," glass breaking, and her mother say, "You son of a bitch." Pam turned to see her mother supporting herself by leaning on the bar with her forearms, holding a broken glass in her right hand, yelling "Pam, Pam he shot me."

Defendant was standing directly behind his bar stool, a few feet from the bar, a black gun in his right hand pointing at the victim, his arm extended straight from his shoulder. When interviewed by police officers later that evening, Pam stated that when she turned around she saw her mother throw a glass at defendant, but at trial she denied making that statement. Her trial testimony was corroborated by evidence of broken glass found only on the bartender's side of the bar.

Defendant's version was somewhat different. He admitted pulling the gun from his waistband, pointing it at the victim, and announcing a holdup. He said he told Mrs. Connors, "Don't be a hero. I just want the money * * *. I don't want to hurt nobody." Defendant claimed that he then pointed the gun at Pam and told her to get behind the bar. As he turned back to the victim, he heard her curse him and felt "a drink" hit him on the face and a glass hit him on the chest. He said he tried to duck, and as he came back up, he pulled the trigger and the gun went off. Defendant maintained that after he ducked, "as I came back up, you know, like I don't feel like I really meant to shoot her, I just pointed the gun, and it just went off."

The events immediately after the shooting were essentially undisputed. Defendant pointed the gun at Pam and ordered her to go behind the bar and get the money from the cash register. Pam took the bills from the register and threw them on the bar. Pam testified that as she moved toward her mother, defendant ordered her back saying he wanted whatever was under the coin tray. Pam complied, then ran to her mother who by this time had fallen face down on the floor. Defendant walked behind the bar, pointing the gun at Pam. He observed the victim, later telling police that he thought he only hit her on the shoulder. According to the police officer who took defendant's statement, at that point "he didn't know if he was going to shoot the victim again," but Pam implored him to "take the money and leave." Defendant left by the side door and returned to his car. His wife testified that as he entered the car he told her:

I just shot a woman. I didn't mean to do it. I didn't want to do it. I just shot a woman.

Because the critical issue at trial was defendant's mental state, the trial court instructed the jury on knowing and purposeful murder, aggravated manslaughter, and reckless manslaughter, as well as on the other indicted offenses. The instructions on manslaughter and aggravated manslaughter permitted the jury to accept defendant's version of the homicide, that it was committed "recklessly," *N.J.S.A.* 2C:11-4(b), or committed "recklessly * * * under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11-4(a).

In instructing the jury on purposeful or knowing murder, *N.J.S.A.* 2C:11-3a(1) and (2), the trial court, not having the benefit of our decision in *Gerald*, did not distinguish between purposely or knowingly causing death, and purposely or knowingly causing serious bodily injury resulting in death. Under *Gerald*, a defendant who intends only to cause serious bodily injury, and not death, cannot be subjected to the death penalty. 113 *N.J.* at 89, 549 *A.*2d 792. Thus, the majority concludes that because of the erroneous charge, it is unable to "determine whether the jury convicted defendant of purposely or knowingly causing death or purposely or knowingly causing serious bodily injury that resulted in death." *Ante* at 560, 575 *A.*2d at 822.

Although I acknowledge that there may be an identifiable ambiguity in the jury's verdict, I cannot agree with the majority's conclusion that the jury's verdict could conceivably constitute a determination that defendant intended to cause only serious bodily injury but not death. *Ante* at 562, 575 *A.*2d at 823. The evidence in this record is simply inconsistent with such a conclusion. Having rejected aggravated manslaughter and manslaughter as optional verdicts, the jury concluded that defendant's state of mind was purposeful or knowing, not reckless. No evidence in this record, however, suggests that defendant's "conscious object" was to cause only serious bodily injury, but not death, to Mrs. Connors, or that defendant was

"practically certain" that only serious bodily injury, but not death, would result from the shooting. See *N.J.S.A.* 2C:2–2b(1) and (2) (defining "purposely" and "knowingly"). The evidence established that defendant shot the victim at close range, the bullet entering her body at a point close to the heart. Under these circumstances, and absent any evidence of an intent only to wound, the risk that the victim would die was so great as to be irreconcilable with "an intent to inflict only serious bodily injury with no intention that death be the result * * *." *State v. Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792. As noted in *State v. Long,* 119 *N.J.* 439, 529, 575 *A.*2d 435, 480 (1990) (Stein, J., dissenting), "one whose 'conscious object' was to inflict serious bodily injury but not death, or who wished to be 'practically certain' that only serious bodily injury would result, would never attempt to achieve that objective by shooting the intended victim in the chest at close range."

Our Court has not specifically considered the *Gerald* holding in the context of a defendant who shoots a victim at close range intending either death *or* serious bodily injury, but not consciously preferring one result to the other. It is quite conceivable that on this record the jury could have concluded that defendant intended to cause either death or serious bodily injury, being indifferent to which of those consequences actually occurred. In view of the jury's conclusion that defendant did not fire the gun accidentally or recklessly, it is consistent with the evidence for the jury's verdict to have constituted a determination that defendant's "conscious object" was either to kill or to seriously injure Mrs. Connors, or that defendant was "practically certain" that death or serious bodily injury would occur, and that defendant did not consciously distinguish between those results. However, our decision in *Gerald* does not exclude that state of mind from the crime of capital murder. As we explained in *Gerald,* our state constitution precludes the imposition of the death penalty on those who act with a "less culpable state of mind, *i.e.,* an intent to inflict only serious bodily injury with no intention that death be the result." 113

*N.J.* at 89, 549 *A.*2d 792. As I read *Gerald,* a defendant whose purpose is to cause either death or serious bodily injury, either being an acceptable result, remains subject to the death penalty.

Acknowledging that the jury charge in this case was not consistent with our holding in *Gerald,* the question before us is whether, "in the context of the entire case, * * * the error was clearly capable of affecting either the verdict or the sentence." *State v. Bey,* 112 *N.J.* 45, 94–95, 548 *A.*2d 846 (1988). The issue is a difficult one. The majority's disposition is justifiable, electing as it does to require that in a capital case a jury must have the broadest range of options before determining whether the defendant's state of mind was consistent with a conviction for capital murder. I reach a different conclusion because I do not believe that our decision in *State v. Gerald, supra,* should be read to insulate from a capital-murder conviction defendants whose conduct cannot conceivably be understood to reflect an intent only to injure. As I read this record, the error in the charge could not be prejudicial unless the jury could have concluded that defendant's intention was only to cause serious bodily injury to Mrs. Connors, but not death. Because there is no rational basis in this record for such a verdict, I cannot join the Court's reversal of defendant's conviction for capital murder.

Justice Garibaldi joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK and O'HERN—4.

*Dissenting*—Justices GARIBALDI and STEIN—2.

*Concurring in part and dissenting in part*—Justice HANDLER—1.